Marguirette Golden, Administrator of the Estate of Seymour Golden, Deceased, Plaintiff-Appellee, v. Big Bear Foods, Inc., Defendant-Appellant.

Gen. No. 51,501.

First District, First Division.

November 18, 1968.

Lloyd P. Douglas, of Chicago, for appellant.

Ozmon and Lewin, of Chicago (Sidney Z. Karasik, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

Plaintiff brought this wrongful death action to recover damages caused by the death of Seymour Golden, plaintiff's intestate. The jury returned a verdict for plaintiff in the amount of $20,000, upon which verdict the court entered judgment. Defendant filed a post-trial motion asking for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The court overruled the post-trial motion in its entirety, and it is from that order that defendant appeals. No questions are raised on the pleadings.

Defendant's theory is that there was no evidence in the case showing that defendant was guilty of negligence or that plaintiff's intestate was free from contributory negli-

gence. In the alternative, it is defendant's theory that he should be granted a new trial because of the court's error in instructing the jury and in refusing to give the jury a special interrogatory on the question of Seymour Golden's contributory negligence. Defendant also contends that the jury's verdict was against the manifest weight of the evidence and was based on a capricious compromise.

Seymour Golden operated a dry goods store known as the Friendly Store at 2309 West Madison Street, Chicago, Illinois. Immediately East of the Friendly Store, the defendant operated the Big Bear Food Store; both stores were on the South side of Madison Street and were separated by a common wall. Behind both stores was an alley which ran in an East and West direction, and in this alley, at a point where the two stores were joined by the common wall, there was an incinerator. The location of the incinerator was such that its midpoint was near the common wall so that about half of the incinerator extended East of the common wall and half of it extended West of the common wall. The incinerator was owned and maintained by the defendant for the purpose of burning garbage and trash accumulated in the operation of the Big Bear Food Store. Located above the Friendly Store were several vacant apartments, previously rented to various tenants. In June, 1959, there was a fire in these apartments, and the tenants were forced to vacate the premises. At the time of this fire, the incinerator was damaged to the extent that it could not be operated, and the manager of the Big Bear Food Store was instructed by a Fire Department official not to use it. The manager then instructed employees of the store not to use the incinerator.

At about 6:00 p. m., on August 6, 1960, Seymour Golden was in the Friendly Store when smoke was noticed coming from the rear of the store. He ordered Curtis Wright, a handyman, to determine what the cause of the

smoke was. Wright went to the alley and observed several boxes burning on top of the incinerator, and that flames from the burning boxes had ignited boards over a boarded up window of the Friendly Store. Plaintiff, who was also in the store, called the Chicago Fire Department. Prior to the arrival of the Fire Department, the smoke coming from the rear of the store was heavy, and flames began to appear. There was a balcony in the rear of the store which was used for storage, and among the items stored there were inflammable items such as paints and varnish. Smoke appeared to be coming from the balcony, and Seymour Golden went up onto this balcony with a hand operated fire extinguisher and attempted to put out the fire. While on the balcony, he was overcome by the smoke and collapsed. At this time, the Fire Department arrived and helped Curtis Wright remove Seymour Golden from the danger area. Seymour Golden was pronounced dead upon arrival at County Hospital. The cause of his death was smoke inhalation.

The issues presented for review are: (1) whether there were sufficient facts or circumstances from which the jury could infer negligence attributable to the defendant; (2) whether the deceased, Seymour Golden, was guilty of contributory negligence as a matter of law; and (3) whether the trial court committed error in refusing to submit to the jury, defendant's special interrogatory.

First, we are called upon to consider several aspects of the evidence presented at the trial. The record discloses that the case was tried on the theory of circumstantial evidence, and the defendant assails the verdict on the grounds that there was no evidence presented identifying any agent or servant of the Big Bear Food Store as having set the fire, nor any evidence of negligence in the maintaining of the incinerator. Plaintiff presented several witnesses at the trial, and relevant portions of their testimony was as follows:

Captain Grabalowski, Chicago Fire Department:

"Q. Now, officer, after you are back out in the alley, could you tell the Court and Jury what, if anything, you observed on the incinerator or in close proximity to the incinerator?

"A. Well, the remains of a lot of burned paper, cardboard wooden boxes.

"Q. And what kind of boxes were they?

"A. They had been used for food products, produce, egg cartons, that type of thing.

"Q. And where were those cartons and boxes located?

"A. All behind the Big Bear Food Mart.

"Q. You mentioned ashes. Where were the ashes located?

"A. In the incinerator, around the incinerator, on top of the incinerator. . . . there had been a fire in it. It had been extinguished and it was still warm. . . . The boxes behind the Big Bear Store that I saw were all around and in front of the incinerator. . . . Some had burned and some had not."

Frank Szwedo, Chicago Police Department:

". . . Q. All right. What else did you observe, if anything, at the time you went to the incinerator?

"A. Well, there was a lot of trash in the alley.

"Q. And where was that trash located?

"A. Well, all over the alley, covering both sides of the alley around the incinerator, just general litter.

"Q. Would you tell us what type of trash you observed when you got back into the alley at the time you had indicated?

"A. Well, it was mostly boxes and crates, things that a grocery store would have, cardboard boxes and wooden crates . . . .

242

"Q. At the time you were back in the alley, what, if anything, did you observe about the incinerator?

"A. There was a smokey substance emitting from the incinerator and I said it was either steam or smoke. And in and around the incinerator was a lot of trash accumulated, burnt material."

Curtis Wright, decedent's handyman:

". . . Q. All right. What if anything after you noticed this smoke did you do?

"A. I went around the back to see what had happened.

"Q. Who sent you out to the back?

"A. Seymour Golden.

"Q. When you got out to the back, what if anything did you observe?

"A. I saw some boxes piled up on the incinerator and right there I saw the fire. . . .

"Q. All right. And when you got there, did you see anyone?

"A. I saw a man.

"Q. Do you know who this man was?

"A. No.

"Q. Could you describe him?

"A. Right.

"Q. Well, describe him for us.

"A. He was light colored man and between thirty and forty. . . .

"Q. Had you seen this man prior?

"A. Right.

"Q. And where did you see him?

"A. On the corner, and sometime in the Big Bear Super Market . . . .

"Q. During the period of time that you worked for the Friendly Store, did you at any time, use the incinerator in the alley behind the Big Bear Store?

"A. No sir.

"Q. How was the trash removed from the Friendly Store?

"A. They have a colored man come about once a week and he taken it out from them. . . .

"Q. During the period of time that you worked for the Friendly Store, Mr. Wright, and before this accident of August 6, did you ever have occasion to see anyone from the Big Bear Store using the incinerator?

"A. Right.

"Q. How often or frequently did you see that?

"A. When I was by the back door. . . .

"Q. Did you see any fire back in the alley near the incinerator or on the incinerator at any time before six p. m. on August 6, 1960?

"A. Yes sir.

"Q. What time was that?

"A. About six-thirty, maybe.

"Q. Six-thirty in the morning?

"A. Right.

"Q. And where was the fire at six-thirty in the morning?

"A. In the incinerator.

"Q. Was there a fire on top of the incinerator?

"A. No sir.

"Q. Too?

"A. No, sir.

"Q. Was there somebody around the incinerator at the time?

"A. Yes, sir.

"Q. And who was that?

"A. The same man, the same one that I saw before.

"Q. And was there anyone else around there at that time?

"A. No, Sir."

244

Homer Slaughter, a Chicago Police Officer:

". . . Q. And what if anything did you observe when you got back into the alley in the rear of the Big Bear Store?

"A. Incinerator was there where it was in use; ashes had been used for burning purposes. . . .

"Q. All right, and after that, Officer, could you tell us what you did?

"A. After leaving that, I went into the Big Bear Store to interview, I interviewed a male caucasian—

"THE COURT: Who, Sir?

"THE WITNESS: A male caucasian who identified themself as the Manager of the store and in conversation with him, he stated that he had previously used, one of his employees had previously used the incinerator to burn rubbish and asked him how the fire started, and he say he has no knowledge of how the fire had started."

Mrs. Marguirette Golden, the plaintiff, testified that she previously observed smoke in the Friendly Store prior to the August 6, 1960 fire. In late winter of 1960 and again in June of 1960, smoke was coming from something burning inside the incinerator, and she complained to Mr. Pinka, the manager of the Big Bear Food Store. Mr. Pinka informed plaintiff that he would "take care of it." Plaintiff's testimony was contradicted when she admitted that she had stated in her deposition prior to the trial that she had not spoken to anyone connected with Big Bear Foods concerning the burning of things in the incinerator, nor that she had any knowledge as to the last time prior to August 6, 1960, that she saw anything burning in the incinerator.

Mr. Pinka, the manager of the Big Bear Food Store, testified that in June of 1959 the incinerator was condemned as a hazard by the Fire Department, yet no repairs were made. He admitted used cartons, boxes and

crates were stored outside of the store in the alley on several days of each week, and that some time after May 1959, unknown persons had started a fire in the alley. Pinka also stated that a fire could not be started in the incinerator due to its damaged condition, and a scavenger service was employed to remove all refuse. Pinka at no time saw any employee of defendant burn anything in the incinerator, and that he did not receive any complaints from the plaintiff relative to the use of the incinerator, although he knew plaintiff and saw her on many occasions. Other witnesses for the defendant stated that defendant did not use the incinerator, the incinerator was not operational, nor did they know of any fire in the incinerator after it was damaged.

■■ Whether the above testimony circumstantially linked the fire to the Big Bear Food Store, and whether an employee of defendant was responsible for the fire were questions of fact for the jury to infer from the evidence presented. "Where there is no eyewitness, a fact at issue may be proved by circumstantial evidence, and such evidence consists of proof of facts and circumstances from which the court may infer other connected facts which usually and reasonably follow according to common experience." Commerce Union Bank v. Midland Nat. Ins. Co., 53 Ill App2d 229, 202 NE2d 688 (1965); Devine v. Delano, 272 Ill 166, 111 NE 742 (1916). While facts may support more than one inference, the jury, in determining liability, is allowed to determine which inferences it will draw from circumstantial evidence. Cardona v. Toczydlowski, 35 Ill App2d 11, 180 NE2d 709 (1962).

In Lindroth v. Walgreen, 407 Ill 121, 94 NE2d 847 (1951), as here, the defendants argued strenuously that there were no eyewitnesses to the occurrence and no direct evidence of negligence on their part, and that the fire could have resulted from other causes. The Supreme Court answered this contention by stating:

246

"There is considerable argument over evidence in the record tending to show that the fire might have been caused by other agencies than the vaporizer. This court, of course, on the contention here in issue, is not concerned with the weight of credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury. . . . The key point of the controversy, is appellants' contention that the fact of defect caused the fire and the injury complained of. There being no eye-witnesses, the determination of this contention must be found in the circumstances revealed by the evidence, if at all. . . . The inquiry here is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached."

The Court also quoted the following from Lavender v. Kurn, 327 US 645, 90 L Ed 916, 66 S Ct 740 (1946):

"Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is complete absence of probative facts to support the conclusion reached does a reversible error appear."

 The facts and circumstances in the instant case constitute a reasonable basis for the jury's conclusion that the defendant was responsible for the fire under the doctrine of respondeat superior, and that the defendant was negligent in the use of the incinerator. The defendant had been warned not to use their incinerator

because of its defective condition, yet Curtis Wright stated he had previously seen someone from the Big Bear Food Store use the incinerator; Wright also testified there was a fire in the incinerator and that boxes were piled up on top of the incinerator. The empty grocery boxes, produce crates and trash were from the Big Bear Store, there being no other grocery store in the immediate area. Captain Grabalowski testified he inspected the incinerator after the fire was extinguished and found the remains of burned paper, cardboard and wooden boxes, the type of boxes and containers in which food would usually be packaged and shipped; the incinerator was still warm. Officer Szwedo testified that litter and trash was strewn about the alley and in and around the incinerator, the type a grocery store would usually discard. While plaintiff's testimony was contradicted by her own statements given at her deposition, the credibility of this testimony remained for the trier of fact to determine. In Oldham v. Kubinski, 37 Ill App2d 65, 185 NE2d 270 (1963), the defendant introduced an impeaching statement of the plaintiff, made prior to trial, to which the jury gave little weight. On appeal, the court said:

> "Even if that statement were to be considered as contradictory, we cannot say the jury should necessarily have adopted the conclusion of the defendants in this respect. The credibility of a witness, including a party, is for the jury to determine; evidence of prior inconsistent statements of a witness, if inconsistent, does not afford substantive proof of the truth of the facts therein stated, but is admissible to impeach the credibility of the witness; the jury is at liberty to draw an inference that the witness was either mistaken or corrupt in his testimony; prior inconsistent statements do not affect the competency of the testimony of the witness, or render his testimony nugatory."

We cannot say that the finding of the jury is contrary to the manifest weight of the evidence presented at the trial.

■ Defendant's next contention is whether the decedent was guilty of contributory negligence as a matter of law due to his attempt to put out the fire in the Friendly Store by himself. Defendant argues that Seymour Golden was in a position of safety at the front of the store, yet left this position of safety and went back to the balcony at the rear of the store with a fire extinguisher to combat the flames and heavy smoke that were beginning to fill the rear of the store. Defendant stresses that Seymour Golden's actions and conduct were foolhardy, and the sole intervening cause of his own death, and that the court below committed error in permitting the jury to decide the case. Ordinarily, the question as to whether Seymour Golden was or was not in the exercise of ordinary care and caution for his own safety must be solved by the jury. The ultimate conclusion of whether the conduct of the decedent is that of a reasonable person acting under similar circumstances shown by the evidence, is also a jury question. Stobbs v. Cumby, 9 Ill App2d 138, 132 NE2d 448 (1956). In the sudden emergency and excitement that arose at the time of the fire, it was not unreasonable for the decedent to take action which he believed necessary at the time to safeguard his property. In the leading case of Illinois Cent. R. Co. v. Siler, 229 Ill 390, 82 NE 362 (1908), the court stated:

> "Where a person sees his property exposed to imminent danger through the negligence of another, he is justified in using every effort to save it which a reasonably prudent person would use under similar circumstances, even though the effort exposes him to some danger which he would otherwise have avoided. . . . If in so doing, and while exercising

such care for his safety as is reasonable and prudent under the circumstances, he is injured as a result of the negligence against the effect of which he is seeking to protect his property, the wrongdoer whose negligence is the occasion of the injury must respond for the damages."

Upon careful consideration of the evidence and the record before us, and tested by the foregoing standard, we cannot say that Seymour Golden was contributorily negligent as a matter of law, nor that his conduct was foolhardy. The trial court properly denied a directed verdict for the defendant on this issue.

██ The final error asserted by defendant was the trial court's refusal to submit to the jury a special interrogatory. The interrogatory submitted is set forth in its entirety:

"Q. Did Seymour Golden, at the time and immediately prior to the occurrence in question, fail to exercise due care and caution for his own safety so that his conduct was a proximate cause of his own death?"

Special interrogatories are provided for in section 65 of the Civil Practice Act, Ill Rev Stats 1965, c 110, par 65, which provides in part:

". . . The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact stated to them in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. . . ."

A special interrogatory must be given to the jury if such interrogatory tendered is upon an ultimate issue of fact

and is in proper form. Debolt v. Wallace, 56 Ill App2d 380, 206 NE2d 469 (1965). As to whether a special interrogatory is in proper form or not, Wicks v. Cuneo-Henneberry Co., 319 Ill 344, 150 NE 276 (1926), sets forth a guiding principle governing the validity of special interrogatories:

> "A special interrogatory is not proper unless it relates to one of the ultimate facts upon which the rights of the parties directly depend, and unless some answer responsive thereto would be consistent with some general verdict that might be returned upon the issues in the case. . . . All reasonable presumptions will be entertained in favor of the general verdict, while nothing will be presumed in aid of the special findings of fact."

■ We note the form of the special itnerrogatory in the instant case is not entirely clear. Such interrogatory asking whether the decedent is guilty of contributory negligence must also ask whether that specific contributory negligence proximately caused the injury. The latter portion of the special interrogatory tendered by defendant, stating ". . . so that his conduct was a proximate cause of his own death?", seeks an answer upon a much broader scope of the question when read in conjunction with the beginning clause of the entire sentence. The only conduct of Seymour Golden that could be considered in reference to the alleged contributory negligence as the proximate cause of his death is that conduct "at the time of and immediately prior to the occurrence in question," and not Seymour Golden's conduct in general, to which the words "his conduct" refer. The use of the words ". . . so that his conduct was a proximate cause of his own death" refers to not only a wider concept, but an entirely different concept than Seymour Golden's conduct "at the time of and immediately prior to the occurrence in question." Seymour Golden's

251

conduct may or may not have been one of the proximate causes of his death, but the jury would have to find that his conduct at the time of and immediately prior to the occurrence was a failure to exercise due care and caution for his own safety, and that that conduct was the proximate cause of his death. It is our opinion that the trial court properly refused to tender to the jury the interrogatory in its ambiguous form. Lau v. West Town Bus Co., 16 Ill2d 442, 158 NE2d 63 (1959).

Defendant objects also to the giving of an issue instruction on the ground that it permitted the jury to find facts not supported by any evidence. The record reveals that the trial court gave special attention to the precise wording of this instruction. Although the court had originally determined to give an instruction on this issue as offered by the plaintiff, when objection was made to it by defendant, the court personally reworded it in an attempt to give an instruction predicated upon the evidence.

From a review of the entire record, we have concluded there was sufficient evidence to warrant the giving of this instruction. The defendant also contends that the verdict was a "capricious compromise" on the part of the jury between the issue of plaintiff's damages and defendant's liability. The jury brought in a verdict of $20,000, which was two-thirds of the death limit. Defendant argues that "if the jury in fact found that the defendant was liable for the death of Seymour Golden, their verdict should have been for a much larger amount than $20,000." This appears to be the basis upon which the defendant asserts that the verdict was a compromise and therefore he should be granted a new trial. While it is true that the jury did not award the maximum recovery permitted by statute, we cannot agree that the verdict was a "compromise" merely because the jury returned a verdict less than the statutory limit. We are

of the opinion that the trial court properly denied defendant's Post Trial Motion for judgment notwithstanding the verdict or in the alternative for a new trial.

Finding no error in the rulings of the trial court, the judgment is affirmed.

Judgment affirmed.

BURMAN, P. J. and MURPHY, J., concur.