HOMER BROOKS, a Minor, by Dorothy Brooks, his Mother and Next Friend, Plaintiff-Appellant, *v.* THE CITY OF CHICAGO, Defendant-Appellee.

First District (4th Division)    No. 81-1042

Opinion filed April 22, 1982.

Perry M. Berke, of Baskin, Server & Berke, of Chicago, for appellant.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Maureen J. Kelly, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Plaintiff, Homer Brooks, appeals from an order of the trial court which set aside the jury's verdict in his favor and which entered judgment notwithstanding the verdict for defendant, the City of Chicago (City). Plaintiff raises the following issues for review: (1) whether the trial court erred in holding that plaintiff was guilty of contributory negligence as a matter of law; (2) whether the trial court erred in holding that there was insufficient evidence to support a finding that defendant was negligent; (3) whether the trial court erred in holding that the verdict of the jury was excessive or a compromise verdict; and (4) whether the trial court erred in holding that the municipal notice served upon defendant was defective and fatal to the cause of action.

We reverse.

Testimony at trial established the following.

Homer Brooks, plaintiff's father, testified that on July 3, 1974, he saw his son, Homer Blane Brooks, with a motorcycle in the alley behind their house. The cycle was owned by a professional motorcyclist who had asked plaintiff to clean it. Because the cycle looked new and expensive, Brooks did not want his son to be responsible for it. Brooks wanted to take it to a friend's garage where the owner could later pick it up. Brooks drove his car, following Homer, who rode the motorcycle. As Homer was riding on Ridgeland Avenue, a one-way street running north, someone crossed the street in front of him. When Homer turned to the right to avoid hitting the person, the motorcycle bounced straight up. Then it began bouncing again from holes in the street and turned on its side. Thereafter, his son failed to control the cycle and fell off. In Brooks' opinion, the speed of the motorcycle was 20 miles per hour. Brooks had been about two car lengths behind the cycle.

The father went over to his son who was bleeding from his ears and nose. Brooks noticed in the street a 3-inch deep depression which was about 4 or 5 feet in length. There were scratch marks alongside potholes. Brooks identified the scratch marks from a photograph taken the evening of the accident. The photograph did not show the potholes or the depression because they were south of the area photographed. After the accident, Brooks went to a nearby fire station to summon an ambulance which took Homer to Jackson Park Hospital. Brooks did not talk with the police at the accident scene or at the hospital.

According to Brooks, his son had learned to ride a motorcycle from a neighbor and had no formal training. Homer had never owned a motorcycle, but he had owned a minibike.

Larry Stafford testified for plaintiff. On July 3, 1974, he was 17 years old and living at 7949 Ridgeland in Chicago where he had resided since

1970. The accident occurred between 5 and 7 p.m. during daylight hours. Stafford was standing on the lawn of his house which was on the east side of the street; he and a friend were talking. He heard a motorcycle, turned and saw its light, then turned back to talk with his friend. Then he saw a girl, who was about 15 years old, run across the street in front of the motorcycle. The cyclist swerved to the right to avoid hitting her, straightened out the cycle which then hit a sewer. The cycle bounced and began hitting depressions in the street; the cyclist lost control. The cycle continued to bounce and tilted. The cyclist could not straighten out the cycle and it fell on its side after sliding down the street. The cycle and the plaintiff ended up on the east side of the street.

Stafford estimated the speed of the motorcycle at 15 to 20 miles per hour. Scrape marks started about 7 feet from the sewer and went beyond the depression which had existed for as long as Stafford had lived there. The witness stated that driving a car over the depression was like driving over speed breakers. Stafford also testified that he did not know the plaintiff or his father. On rebuttal, Stafford said that repairs were made on Ridgeland after July 3, 1974, and before May 12, 1975, when photographs were taken of the street which did not show a depression.

Joseph Flores, a Chicago police officer, arrived at the scene of the accident at 7:40 p.m. which was 5 to 20 minutes after the accident. The weather was clear and dry; it was just beginning to get dark. Flores could not recall seeing either the ambulance or the plaintiff at the accident scene, but he did see plaintiff in the emergency room of the hospital. The motorcycle was lying on its side in the middle of Ridgeland Avenue and marks in the center of the street led up to it. Flores measured 87 feet of scrape marks. An evidence technician photographed the marks. A diagram in Flores' report indicated that there was a dip in the street, but he could not tell if the photograph of the marks included the area of the dip.

When Flores testified on behalf of defendant, he stated that the dip was not sufficient to cause a cyclist to lose control and that there were no potholes in the street. From the length of the marks, he determined that plaintiff was traveling 45 to 50 miles per hour. Flores said that if plaintiff had been going only 15 miles per hour, the marks would have been 10 to 15 feet in length. After the accident, a man asked Flores what had happened. When Flores asked the man who he was, the man said, "I am the kid's father." The officer said, "I don't know. I just got here." Flores did not remember what the father looked like, nor did he write the father's name in the police report or make notes of the conversation. Flores said that pictures taken on May 12, 1975, showed the street in the same condition as it appeared at the time of the accident.

Dorothy Brooks, plaintiff's mother, testified that after her son was injured, he remained in intensive care at the hospital for 9 days. During his

hospitalization, Homer was paralyzed on the left side of his body. He could not use his left arm and leg, his mouth was twisted, his eyes were crossed and he appeared to be confused. Homer was transferred from the hospital to the Schwab Rehabilitation Hospital for therapy. While there, he was depressed, confused and wanted to go home. A week after this transfer, Homer fell from a window and sustained a spinal injury. After a second hospitalization, Homer returned to Schwab for therapy. When he left the rehabilitation center, he walked with a limp in his left leg and used a cane. His eyes were crossed and he was still confused, forgetful and restless. Homer went to Spalding, a school for handicapped children, briefly. He also attended public high school for a short time. After a while, he secured a job pumping gas. In 1978, he was hired by U. S. Steel but was laid off in the spring of 1980. Mrs. Brooks stated that her son is still forgetful, has irritable moods and is irresponsible. At times, his eye pops out.

Dr. Isaac Martin Thapedi, a neurological surgeon, treated plaintiff in the emergency room of Jackson Park Hospital in July 1974. Plaintiff was unconscious and paralyzed on his left side. Spinal fluid was coming out of plaintiff's right ear; blood was flowing from his nose. Thapedi's diagnosis was basal skull fracture. Homer's brain stem was damaged.

When Homer was released from intensive care, he breathed on his own but was confused and disoriented, restless and agitated. The paralysis on his left side had improved. When Homer left the hospital, his speech was coherent, but he had periods of confusion and disorientation. He was still paralyzed on his left side, the arm to a greater extent than the leg. Paralysis of the cranial nerves affected Homer's eyes, causing the right upper lid to drop and the eyes to turn inward.

Dr. Thapedi saw Homer again on October 22, 1974. Homer complained of being absent-minded and of having nightmares. The cranial nerves had returned to normal but there was weakness in the left arm. On Homer's last visit in August 1977, he complained of dizziness and low back pain. He had returned to almost complete normalcy. According to Thapedi, Homer is likely to develop infection of the brain and is a candidate for seizures as a result of his brain stem injury.

Dr. Pabme Sundarum treated plaintiff at Schwab Rehabilitation Hospital in August 1974. Her examination revealed that plaintiff suffered from cranial nerve paralysis, his eyes deviated inward, his muscle tone was depressed, and coordination on his left side was impaired. Plaintiff was depressed, anxious about his disability, crying and wanting to go home. While at Schwab, he tied bed sheets together, climbed out of the window, fell down and injured his spine. In Sundarum's opinion, plaintiff's spinal injury was caused because of depression about his brain injury. On cross-examination, Sundarum said that in her treatment she

relied on a psychological evaluation that stated plaintiff had poor impulse control. According to this report, plaintiff was unable to control impulses or actions; he exhibited aggressiveness, hostility and childlike behavior. Sundarum also relied on a social worker's report that indicated plaintiff had been a patient in a child psychiatric clinic 2 years before the accident.

Homer Blane Brooks, plaintiff, testified that he had no recollection of the accident. He remembered being in the alley behind his house and seeing his father. At that time, plaintiff had a motorcycle owned by a friend named Rudolph who rode at neighboring tracks and performed in shows. Rudolph had asked plaintiff to clean the cycle for a show. Plaintiff had the motorcycle for 2 or 3 days before the accident and had kept it in a friend's garage. On July 3, 1974, plaintiff knew how to ride a motorcycle, having picked up the skill on his own. Before the accident, plaintiff had ridden two or three of Rudolph's motorcycles for 10 or 11 months.

Plaintiff's only recollection of his stay at Jackson Park Hospital was that he was hungry. He remembered that when he was at Schwab, his left side was weak and his eyes were crossed. He was depressed and forgetful. He decided that the best place for him was his own home. He tied sheets together to get out of the window, but he could hold on only with his right hand. He could not hold himself with only one hand and so he fell. After this accident, plaintiff was taken to Mount Sinai Hospital and put in a body cast.

After being released from Schwab, plaintiff attended Spalding school for about 1 month. He felt out of place, was impatient and could not concentrate. Plaintiff tried to go back to public school, but he was behind the other students and did not do well.

At the time of trial, plaintiff noticed that his leg stiffens after he runs for one-half block. He had regained normal strength in his arm and hand, but he was still forgetful and occasionally confused.

Dr. Charles F. Samelson, a psychiatrist, testified for defendant. He had a psychiatric consultation with plaintiff at Schwab in September 1974. In his opinion, plaintiff was depressed at that time because 2 years before the motorcycle accident, plaintiff had given his brother a loaded gun with which the brother had killed himself. Samelson's diagnosis was chronic traumatic neurosis which caused plaintiff's nightmares, depression, restlessness, aggression and poor impulse control. According to Samelson, plaintiff's memory was intact.

Ludwig Leskavar, a legal investigator for the city of Chicago, talked with plaintiff's occurrence witness, Larry Stafford, on September 15, 1980. When asked how the accident happened, Stafford said that plaintiff tried to avoid hitting a girl who had come from between two cars. Leskavar made an oral report to the defense attorney but did not take notes or make a written report of this conversation.

Mary B. Jennings, coordinator and chief instructor of the motorcycle rider education program in Cook County at Northeastern Illinois University, testified for defendant. She described the training necessary to properly operate a motorcycle: a 20-hour course consisting of 12 hours of riding and 8 hours in the classroom. She was familiar with the type of motorcycle involved in the accident, a Honda 450. Jennings stated that a slight turn would cause it to accelerate rapidly.

At the close of all the evidence, the jury found for plaintiff in the amount of $67,000. A special interrogatory found plaintiff not guilty of contributory negligence. The trial court granted defendant's motion for judgment notwithstanding the verdict because it found the evidence in favor of plaintiff insufficient under the *Pedrick* standard. The court held that plaintiff was guilty of contributory negligence as a matter of law and that defendant was not negligent. In the trial court's opinion, the verdict was a compromise, notice provisions were not complied with, and the failure of plaintiff to call all the physicians listed in the notice deprived the City of valuable information. Plaintiff appeals from the order granting defendant judgment notwithstanding the verdict.

The primary issue raised by this appeal is whether the trial court order granting judgment *n.o.v.* was proper. In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, our supreme court adopted the following rule:

"In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand." 37 Ill. 2d 494, 510.

■■ Applying the *Pedrick* rule to the instant case, we hold that the trial court erred in granting judgment *n.o.v.* to defendant. When all the evidence is viewed in the aspect most favorable to plaintiff, it does not favor defendant. Plaintiff introduced evidence of reasonable care in riding the motorcycle. Two witnesses testified that the speed of the cycle at the time of the accident was about 20 miles per hour, and plaintiff had been riding motorcycles for almost 1 year. Plaintiff also introduced evidence of defendant's negligence, the existence of a depression several inches deep in the street. Defendant presented contrary evidence. However, it is the jury's function to resolve substantial factual disputes requiring either the assessment of witness' credibility or an election between conflicting evidence. (*Sunseri v. Puccia* (1981), 97 Ill. App. 3d 488, 491, 422 N.E.2d 925, 929.) Further, when the evidence supports the jury's verdict and there is no showing that a party was denied a fair trial, it is an abuse of discretion for the trial court to substitute its judgment for that of the jury. The jury's verdict should not be disturbed by the trial

court unless it is unreasonable, arbitrary and unsupported by the evidence. Neither the trial court nor the appellate court should sit as a second jury. (*Looft v. Missouri Pacific R.R. Co.* (1982), 104 Ill. App. 3d 152, 432 N.E.2d 1152.) In the case at bar, we find the verdict of the jury amply supported by the evidence. Therefore, it was error for the trial court to find plaintiff guilty of contributory negligence as a matter of law and to find evidence of defendant's negligence insufficient in contravention of the jury verdict.

Plaintiff's next contention is that the trial court erred in finding that the jury verdict was excessive or a compromise. The trial court stated:

"THE COURT: I think the verdict of the jury was excessive, that it was a compromised verdict. A few minutes before they arrived at the verdict they said they were absolutely unable to arrive at a verdict. Two minutes later they said they have a verdict. What do they have?· They have a verdict of $67,000, that is $17,000 of medical expenses and they throw in $50,000 of the City's money. If they thought that the plaintiff was entitled to a verdict he was entitled to every penny you asked for and more.

MR. BERKE [plaintiff's attorney]: In other words, if the plaintiff was to win this case they should have given him what I asked for?

THE COURT: And more.

MR. BERKE: And since they gave him less it indicates the jury didn't do their job properly?

THE COURT: Just compromised."

■█ The amount of damages is primarily a question of fact for jury determination. (*Horton v. City of Ottawa* (1976), 40 Ill. App. 3d 544, 551, 352 N.E.2d 23, 28.) In *Golden v. Big Bear Foods, Inc.* (1968), 102 Ill. App. 2d 237, 243 N.E.2d 730, defendant argued that the jury verdict in a wrongful death action was a compromise because it was less than the maximum recovery permitted by statute. The appellate court stated: "we cannot agree that the verdict was a 'compromise' merely because the jury returned a verdict less than the statutory limit." (102 Ill. App. 2d 237, 252.) We hold that in the instant case, the trial court erred in finding that the jury verdict was a compromise.

Plaintiff's final contention is that the trial court erred in holding that the notice served upon the City was defective. The trial court gave two reasons for this holding: (1) the notice stated that the accident occurred "at or near the public sidewalk" of 7945 South Ridgeland rather than on the street; and (2) the plaintiff did not call all the physicians listed in the notice. In *Greene v. City of Chicago* (1976), 48 Ill. App. 3d 502, 363 N.E.2d 378, *aff'd* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205, an alleged defect in the notice was that the location of the accident was listed as "105th and Wentworth" instead of the actual intersection of 104th and Wentworth.

We held that plaintiff had substantially complied with the notice requirements of section 8—102 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1969, ch. 85, par. 8—102) because the city had received actual as well as statutory notice of the exact location of the accident. *Greene v. City of Chicago* (1976), 48 Ill. App. 3d 502, 511.

■■ In the instant case, we hold that plaintiff substantially complied with the notice requirements of section 8—102. Defendant was aware that the accident happened in the street because plaintiff alleged negligent maintenance of the street and also because of the police report. Finally, we find no authority for the proposition that failure to call all physicians listed in the notice must be construed as a defect in the notice itself.

Defendant contends that assuming arguendo the trial court erred in entering judgment *n.o.v.*, it should have granted defendant's post trial motion for a new trial. Defendant alleges as prejudicial error the court's refusal to give the following instruction:

> "There is in force and effect a law in the State of Illinois which provides that slight inequalities in level, or minor defects frequently found in the public way are not actionable.
> . Whether the evidence in this case established that there was a minor defect is for you to decide."

The trial court allowed the following instruction: "A city has a duty to use ordinary care to maintain streets in a reasonably safe condition."

■■ A liberal application of the harmless error doctrine to jury instruction issues is favored when it appears that the rights of the complaining party have in no way been prejudiced. (*Quick v. Nagel* (1980), 85 Ill. App. 3d 342, 347, 406 N.E.2d 835, 838.) Defendant has not shown how it was prejudiced by the failure to give its instruction nor do we see how defendant could have been prejudiced even assuming that it was error to refuse to give the instruction. We conclude that the trial court did not err in refusing to grant defendant's motion for a new trial.

. This cause is reversed and, pursuant to our authority under Supreme Court Rule 366(a)(5) (73 Ill. 2d R.366(a)(5)), judgment is entered on the verdict of the jury in favor of plaintiff and against defendant for $67,000, plus costs.

Reversed, with judgment here.

ROMITI and LINN, JJ., concur.