Marvin Ricklefs, a Minor, by Edna Ricklefs, his Mother and Next Friend, Appellee, v. Chicago, Milwaukee, St. Paul and Pacific Railway Company et al., Defendants. Commonwealth Edison Company, and City of Chicago, Appellants.

Gen. No. 45,932.

Opinion filed November 30, 1953.
Released for publication March 5, 1954.

ISHAM, LINCOLN & BEALE, and GRIFFEN, STOUT & BAIRD, all of Chicago, for certain appellant; JAMES P. DILLIE, GLENN E. BAIRD, and ARTHUR C. GEHR, all of Chicago, of counsel.

JOHN J. MORTIMER, Corporation Counsel for City of Chicago, for certain other appellant; L. LOUIS KARTON, Head of Appeals and Review Division, and HARRY H. POLLACK, Assistant Corporation Counsel, both of Chicago, of counsel.

JOSEPH BARBERA, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Marvin Ricklefs, a minor, by his mother and next friend, brought suit to recover damages from Chicago, Milwaukee, St. Paul and Pacific Railway Company, City of Chicago, Commonwealth Edison Company, William Marten and Florence Klipfel for personal injuries sustained by plaintiff as the result of the alleged negligence of defendants. At the close of plaintiff's case the court directed a verdict of not guilty for the railroad company and entered judgment on the verdict. At the conclusion of the trial there was a verdict finding the individual defendants William Marten and Florence Klipfel not guilty, the corporate defendants City of Chicago and Commonwealth Edison Company guilty, and assessing plaintiff's damages in the amount of $70,000 and costs, upon which the judgment was entered from which this appeal was taken.

The accident occurred on the afternoon of Sunday, September 26, 1948. Plaintiff and two companions, Jerome Reinke and Lawrence Pritchett, left their homes on bicycles in Norwood Park and rode down Austin avenue some 44 blocks to the railroad viaduct at Austin avenue and Cortland street. Upon arriving at the north end of the viaduct they rode along the west sidewalk the entire length of the underpass beneath the viaduct to the south end, then turned around and started back, heading north on the west sidewalk. Upon reaching the middle of the underpass they saw a stairway on the east side thereof and decided to cross the street to investigate it, parking their bicycles on the west sidewalk. They then crossed the street in the middle of the underpass and went up the stairway, remaining at the top of the stairway for a few minutes, and then returned down the stairs. When they reached the east sidewalk, Jerome ran across the street in the middle of the underpass to the parked bicycles. Before he stepped off the curb on the east side, he looked both

ways and saw two cars approaching from opposite directions, approximately half a block away from either entrance.

As plaintiff started to cross, he saw three cars, one of which was about one-fourth of a block from the south entrance and was heading north; behind this car was another automobile traveling in the same direction; the third car was about a quarter of a block north of the underpass, heading south. After seeing these cars, and when Jerome was ten to twelve feet in front of him in the middle of the street, plaintiff started to cross at a slow trot. When he reached the middle of the street he stopped and stood perfectly still between the north and southbound lanes; he made no attempt to return to the east curb. While he stood in the center of the street waiting for an opportunity to cross, he was struck by the first car heading north which he had seen while on the sidewalk. After leaving the east sidewalk, he did not look at or see that car again. There were no noises or other distractions to prevent his observing the car that struck him.

Lawrence stepped to the east curb from the east sidewalk when plaintiff started to cross the street. He looked and saw two cars approaching from the south, the first of the two cars being at about the south entrance of the underpass, and a third car approaching from the north at about the same distance. He was watching plaintiff all the time and saw him struck by the front bumper of the first car approaching from the south and thrown about 20 feet north, landing on his back one or two feet from the east curb, with his head toward the north. After hitting plaintiff the driver of the car applied his brakes and stopped about 20 feet beyond the point of impact; he got out of his car, picked plaintiff up, put him in the car and drove him to the hospital. Upon arriving there he noticed that the right

323

front grille of the car was damaged, but the left side of the car was not damaged in any way.

William Marten was driving the car that struck plaintiff; it was owned by Florence Klipfel, who was sitting in the front seat. When they entered the underpass the car was in the inner northbound lane traveling at a speed of 20 to 25 miles per hour. Just before Marten entered the underpass he was more or less blinded by the sun, and he testified that he immediately turned on his city driving lights. The testimony of the boys conflicts with that of the individual defendants in this respect, the boys stating that they did not remember seeing any cars with headlights on. Neither of the individual defendants saw plaintiff until after the collision, and after they had stopped and left the car to investigate the cause of the impact which they had felt. They testified that they could see very little in the underpass; with city driving lights on, Marten stated that he could see about 50 feet ahead of the car, but very little to either side of the path in which the car was traveling. Both individual defendants testified that the car was at all times traveling in a straight direction in the inner northbound lane and that it did not swerve after the collision or as it came to a stop.

With respect to the construction and lighting of the viaduct, it appears that in July 1938 the city and the railroad company entered into a contract for building the viaduct and underpass at the intersection of the railroad's right-of-way and Austin avenue. By the terms of the agreement the railroad granted the city an easement across its right-of-way and divided the cost of construction and responsibility for the project. Among other things, the city agreed to furnish at its own cost the labor and materials required for installation of the street lighting in the viaduct and underpass and upon completion of the viaduct to maintain and

operate at its own cost the street and viaduct lighting system in the underpass. The underpass is 658 feet long, the street 44 feet wide from curb to curb, and the rows of concrete columns supporting the overhead structure are set back one foot from the curbs on each side of the street. Each column is four feet wide and two feet thick. There is a sidewalk eight feet wide on each side of the street which is separated from the roadway by a row of columns. Both sidewalks run the entire length of the underpass. There is a light vent approximately in the middle of the underpass that is ten feet wide and crosses the entire width of the overhead structure; this vent is protected by a metal grille so that persons working on the railroad right-of-way will not fall through the opening. There is a stairway approximately in the middle of the underpass located east of the east sidewalk and leading to the railroad right-of-way.

The street and sidewalk lighting system consists of 68 lighting fixtures embedded into the concrete structure about nine feet above the sidewalks, so that almost all the light is reflected onto the surface of the sidewalks. The sidewalk lights are spaced about 19½ feet apart, and each fixture provides the lighting of a sidewalk area of approximately 155 square feet. There are 104 lighting fixtures recessed into the concrete structure between the columns on both sides of the street about eleven feet from the surface. These fixtures are embedded so that the face of the fixture is almost flush with the side of the concrete wall, and little, if any, of the light from these fixtures is directed down to the surface of the roadway. The roadway fixtures are spaced about thirteen feet apart so that each one covers an area of the roadway of approximately 291 square feet, or almost twice the area covered by each sidewalk lighting fixture. Two time switches are installed at the

325

south end of the viaduct at the east and west sides of the street. The time switch on the west side controlled every other light fixture over the west sidewalk and on the west side of the roadway; similarly, the time switch on the east side controlled every other light fixture over the east sidewalk and on the east side of the roadway.

In 1927 the city and Commonwealth Edison Company entered into a basic contract providing for the lighting of the city's streets and subways, including viaducts or underpasses, which was in effect on the day of the accident but was subsequently canceled in 1950; the duties of patrolling and inspecting the lights was taken over by the city when the basic contract was canceled. The pertinent portion of this contract provides that the company is to furnish the city electric service for city uses as specified and at rates set out in the agreement. The basic contract was supplemented by a letter from the city to Edison dated October 18, 1938, requesting the company to furnish lighting service for the underpass in question and authorizing the charge at the regular subway rates. This letter also provides that sixty-watt lamps should be used in all the lighting fixtures and that eighty-six, or one-half, of the lamps should be operated on a dusk-to-daylight schedule, and the other half on a twenty-four hour schedule. The company commenced the service on January 4, 1940. Further supplementing the basic contract, the city prepared and sent to the company a schedule for control of the time switches so that every other light over the sidewalks, and on both sides of the roadway would be turned on shortly after sunset and turned off shortly before sunrise each day of the year.

Plaintiff takes the position that both the city and the Edison Company owed a duty to all persons rightfully using the highway to exercise reasonable care in keeping and maintaining it in a safe condition for use as a

326

public street. It is urged that since the city constructed the underpass, thereby, as plaintiff puts it, creating "the hazard of darkness in the street which had not theretofore existed," and undertook to light it, it thereby assumed the duty to adequately light the underpass for all persons rightfully using the street and "for all purposes," regardless of whether they were crossing or traveling thereon; and that since the Commonwealth Edison Company assumed the city's legal obligation in this respect, it likewise owed a duty to all persons using the street within the underpass to carry out this duty with reasonable care and diligence.

Several witnesses, some employed by the Edison Company and others by the City of Chicago, explained the procedure adopted by these two corporations during the period of operation of the contract. The lighting contract did not specify the frequency of the patrols that Edison was required to make under the agreement, but the company scheduled itself to patrol each viaduct and underpass every night of the year. Daily inspection included reporting burned-out lights and immediate replacement of light bulbs in the center post lamps where there was a column in the center of the street; time switches were set every two weeks in accordance with the dusk-to-daylight schedule furnished by the city. The patrolmen noted all outages in their route books which, upon completion of their assignments, were left with the work dispatcher in the central office of the company; individual outage reports and follow-up renewals were written up for each underpass by the dispatcher and forwarded to the lighting-maintenance supervisor, who reviewed and routed the work assignments on a district basis; and on completion of the renewals the servicemen returned the outage reports to the central office for checking and filing.

Arnold Johnson, an experienced Edison patrolman assigned to inspect the route including the underpass in question, testified as to his method of inspection and stated that there were no entries in his route book between September 21, 1948 and September 29, 1948, which meant that there were no outages during that period. James McCauley, an Edison renewal serviceman, testified that he replaced burned-out light bulbs in the Austin avenue underpass on September twenty-third, and stated that at that time, as well as for two or three years prior thereto, he had always used sixty-watt bulbs, in accordance with the contract between the company and the city.

Testimony as to the lighting of the underpass is conflicting. Witnesses testifying on behalf of plaintiff stated that some of the underpass lights were off, whereas, as indicated above, Edison witnesses testified that the underpass was fully illuminated at the time of the accident. Various witnesses estimated that unlighted areas extended from as little as 20 feet to as much as 150 feet. All the witnesses agreed that it was necessary for drivers to utilize their city-driving lights. Pedestrian witnesses testified that they could see from 60 to 80 feet beyond them, and plaintiff himself stated that he saw cars approaching the viaduct at a distance of about a quarter of a block from either entrance and could determine in which lane the cars were traveling; that when he was in the center of the street he was able to determine that the car approaching from the north was 75 to 80 feet from him; that the lighting was sufficient to permit him to see that the street was a tan color and he was also able to observe a black line in the center of the street; that he saw Reinke walking to his bicycle on the west sidewalk when he (plaintiff) was in the middle of the street; and that the distance he could see depended on the way he was looking.

328

Thus premising his case on the primary liability of the city and the secondary liability of Edison, plaintiff's counsel argues that the evidence clearly establishes negligence on the part of both the city and the Commonwealth Edison Company in failing to provide adequate lighting. Accordingly the issue presented is whether or not the city, having elected in the exercise of its legislative discretion to install a lighting system in the underpass for a limited purpose, as it and the Edison Company contend, thereby assumed the obligation to illuminate the underpass for all purposes which the public might consider convenient. We are therefore called upon to decide to what extent a municipality is free to determine for itself the uses for which and the degree to which it will light its streets and underpasses. So far as we have been able to determine, the cases go no further than to require the city to light or warn against known dangers or obstructions; the courts in this State have refused to go beyond this, recognizing that the determination of the quality and the amount of light to be given is a legislative function rather than a judicial one. Although counsel for the respective parties cite many cases bearing upon this question, we think the obligations of the city and the Edison Company to plaintiff rest upon legal principles set out and discussed in three early Illinois decisions: *City of Chicago v. Powers, Admx.,* 42 Ill. 169; *City of Freeport v. Isbell,* 83 Ill. 440; and *City of Chicago v. Apel,* 50 Ill. App. 132; and the reasoning adopted in those decisions has been followed in *Johnston v. City of East Moline,* 405 Ill. 460. In the *Powers* case plaintiff's intestate was killed when she walked past an insufficiently lighted barricade to the approach of an open bridge and fell into the river. Without discussing the general obligation to light the street, the court held that because the city had undertaken to light the street

approach to the bridge and the barricade, it was liable for its negligence in not lighting it properly. Later, in the *Isbell* case, the court expanded on this doctrine, saying: "It might be a matter of great convenience to have all our cities or incorporated towns well lighted, in the night-time, with gas, and it might add to the security of pedestrians whose business or tastes might require them to travel at late hours of the night; but to hold that a city or incorporated town was under a legal obligation to thus provide the streets with light, might well be regarded as an act of usurpation, on the part of the courts, of the legislative power, which has been exclusively delegated to the legislative department of the municipality"; and it distinguished the *Powers* case by underscoring that there "the city had lighted a certain bridge where the accident occurred, as well as the street; but the injury arose from the fact that the light furnished by the city was insufficient to afford proper protection." The opinion in the *Apel* case was based on the theory that a municipal corporation, although it has the power to light and pave streets, is not bound to do so; and further that when, either from its having undertaken to do so, or from any other cause it becomes the duty of such corporation to light an approach or a street, it is sufficient if it do so in such a manner that it is in a reasonably safe condition for travel in the ordinary modes. The *East Moline* case arose out of an accident caused by a traffic control system that was defective in that it was only partially operative, and, in the light of the *Powers* and *Isbell* decisions, the court synopsized the applicable rule to be that "a municipal corporation acts judicially or exercises discretion when it selects and adopts a plan in the making of public improvements, but as soon as it begins to carry out that plan it acts ministerially and is bound to see that the work is done in a reasonably safe

330

and skillful manner," and added that each case must be decided as it arises.

Evidence adduced by the corporate defendants here upon this phase of the case shows that of the 172 lighting fixtures installed in the underpass, 68 were for sidewalk lighting and 104 for roadside lighting. The sidewalk fixtures were approximately nine feet above the surface of the sidewalk and were recessed into the ceiling directly over the sidewalk so that almost all the light from the fixtures was focused onto the surface of the sidewalk; they were spaced along the center line of the ceiling so that each lighting fixture illuminated an area of about 150 square feet.

██ In contrast to the sidewalk lighting system, the roadside lighting fixtures were about eleven feet from the surface of the road and were embedded into the concrete walls between the columns so that their illumination was not directed down to the surface of the road but was projected, for the most part, to a line parallel thereto. Furthermore, in contrast to the sidewalk lighting system, the roadside lighting fixtures were so spaced that each fixture, if it had been designed to illuminate the surface of the road, would have to light an area of about 290 square feet. In other words, the intensity of the illumination of the road is approximately one-half that of the sidewalk, assuming the same size light bulbs were used in both places, as in fact they were. There is no dispute as to this evidence, and the obvious conclusion to be taken therefrom is that the roadside lighting fixtures were not intended to illuminate the road or objects on the road, and that if the engineering plans had been designed to light the surface of the road, the lights would have been installed in the ceiling over the road in the same manner as the sidewalk lights so that all the lighting would have been focused on the road itself; the plans, in addi-

331

tion, would have provided for a greater number of lighting fixtures to accommodate high-speed traffic. A photograph of the viaduct and underpass indicates that the roadside lights act as a guide to motorists as to the physical layout of the street. This latter consideration is particularly important at night when entrances to the viaduct are not illuminated by daylight; the fact that the daylight in the entrance acts as a guide for the motorist probably explains why it was not considered necessary to light more than one-half of the lights during the daylight hours.

With these considerations in mind it appears to us that the lighting system in the underpass is not intended to and could not illuminate the roadway, and therefore light-bulb failures could not have been the proximate cause of the accident. The physical fact is that if every light in every pillar fixture had been turned on there could not have been an illuminated roadway at the time of the accident; there could have been no light cast on plaintiff and no protection given him against the car which actually struck him. Plaintiff's witness, Police Officer James Battle, assigned to accident-investigation work, testified that "none of the lights that were on threw any light on the roadway itself," and of course they could not because they were eleven feet above the street level, were recessed six inches into the pillars, and each fixture was covered with a frosted glass.

In advancing the contention that the city created a darkness hazard when it constructed the underpass, plaintiff places his own construction upon the use of the underpass by the public and the purpose of the lighting system therein, disregarding entirely the legitimate function of the underpass, which provided separate facilities for pedestrians and motorists. Plaintiff cites no authorities to support the contention

332

that in constructing the underpass the city was obligated to provide lighting adequate under all circumstances or that it was required to so light the underpass that motorists would see pedestrians crossing from one side to the other; the underpass was not laid out to include a crosswalk, and it follows that the lighting plans would not be designed to accommodate pedestrian traffic across the underpass proper.

Additional grounds urged by defendants for reversal need not be discussed, in view of our conclusion that plaintiff failed to prove that either the city or the Edison Company was negligent in adequately lighting the underpass, considering the purpose for which it was constructed, or that any act of either defendant was the proximate cause of plaintiff's injury. For the reasons indicated we are of the opinion that the court should have directed a verdict for both corporate defendants at the close of all the evidence, or should have entered judgment in their favor notwithstanding the verdict. Accordingly the judgment of the circuit court is reversed and the cause remanded with directions that judgment be entered notwithstanding the verdict in favor of both corporate defendants, costs to be assessed against plaintiff.

*Judgment reversed and cause remanded with directions.*

NIEMEYER, P. J. and BURKE, J., concur.