LEOPOLDO HERNANDEZ, Plaintiff-Appellant, *v.* POWER
CONSTRUCTION COMPANY, Defendant-Appellee.

First District (4th Division)   No. 60463

Opinion filed November 10, 1976.

Alvin E. Rosenbloom, William J. Harte, and Lawrence T. Stanner, all of Chicago, for appellant.

John B. Grogan and Patrick T. Driscoll, Jr., both of Chicago, for appellee.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The plaintiff, Leopoldo Hernandez, brought this action under the Structural Work Act against the Power Construction Company, a general contractor, for personal injuries sustained in a fall from a scaffold. At a bench trial in the Circuit Court of Cook County the court granted the defendant's motion for judgment at the close of plaintiff's evidence, and the plaintiff appeals from that judgment.

The issues for review are whether the court abused its discretion when it refused to permit the plaintiff to file a jury demand when the defendant withdrew its demand immediately before trial, whether the judgment of the trial court was contrary to the manifest weight of the evidence, and whether the court committed reversible error in refusing to admit the opinion of an expert witness into evidence.

The plaintiff testified he was a laborer for Frank Miller & Sons Fireproofing, a bricklayer contractor. At the time of his injury he was employed in the building of the Washburn School at Hibbard and Elm Streets in Winnetka, Illinois. His duties consisted of making mortar, supplying the bricklayers with mortar and brick, building scaffolding and cleaning up.

On the afternoon of October 1, 1968, he had started to erect a scaffold on the central half of the building at the direction of his foreman. He testified it was a patent scaffold of a tubular type which came in two sections. It was in the shape of an "H" with crossbars that go from top to bottom connecting the two frames into one solid piece of equipment.

Each of these frames is five to six feet high and can be placed one on top of another. The scaffold he built was over ten feet high.

He testified he did not erect any toe boards or mid-rails and had never been told to erect them on the more than half dozen scaffolds he had built on that job site. He had not seen any other scaffolding on that site that had guard rails, mid-rails or toe boards, and he had supplied brick and mortar to bricklayers who worked on scaffolds without such protections. He laid planks across the beams of the scaffold, but he did not fasten them in any way. His normal working hours were 7:30 a.m. to 3:30 p.m., but on that particular day he left at 2:30 p.m. He informed the foreman that the planking had not been completed on the east wall.

On October 2, he arrived at the job site at 7:15, had a cup of coffee and then walked toward the section of scaffold he had built the previous day and where he was to work on that day. There was a mortar mixer and a labor foreman there from Frank Miller & Sons Fireproofing as well as numerous other workers from the other trades. He stated he was supposed to start supplying the scaffold with mortar to get the bricklayers started at 8 o'clock.

When he arrived, he observed the scaffold had been completed as the foreman told him it would be. When he said completed he meant there was planking on the scaffold. No ladder was attached to the scaffolding, so he used the stairwell to get up to the second floor. From the second floor to the scaffold planking was a drop of about three feet. He went over to the side of the building and "more or less half stepped and half jumped to get down to the scaffolding." As he stepped down his foot caught on a two by four that had been put through the braces of a wheelbarrow for hoisting purposes, and he stumbled back toward the end of the scaffolding. He stated that when he hit the planking, "the plank and everything just went up. It just threw me over." The wheelbarrow flew over his head and landed in a large trash bin. He bounced off the side of the bin and landed on a two by four on the ground. The plank itself flipped up and then slid down and hit him.

He testified that George Erda, the superintendent of the Power Construction Company, emerged from the general contractor's shack and told one of the men to drive him to the hospital, where it was determined he had sustained extensive injuries.

George Erda testified he did not see the plaintiff fall and only found out about the accident a year or more later when he heard some employees discussing it on another job site. He stated he could not recall the condition of the scaffold on that day and did not know whether it had been completed or not.

Immediately prior to trial and after certain evidentiary matters had been discussed and ruled on by the court, the defendant withdrew its jury

demand. Plaintiff's counsel objected and then requested the court permit him to pay the required fee so his client might have a jury trial. Counsel for the defendant then stated to the court: "I've viewed the matter at some detail with my principals and they are aware of the request and—particularly in view of the court's ruling with respect to the introduction, the utilization of the contract documents. I'm—I believe that we would prefer this—to have this case tried by your honor, as the trier of facts rather than by a jury of laymen. I think it's our right to withdraw our jury demand." The court allowed the withdrawal and denied the plaintiff's request for a jury.

The plaintiff first contends it was an abuse of discretion for the court to deny his request for a jury immediately prior to trial when the defendant withdrew its demand. Section 64 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 64) provides that a plaintiff must demand a trial by jury at the time the action is commenced or is deemed to have waived that right, but the court has discretion to allow a late jury demand pursuant to section 59 of the Civil Practice Act and Supreme Court Rule 183 (Ill. Rev. Stat. 1971, ch. 110A, par. 183). Relevant portions of those sections provide as follows:

Section 64 of the Civil Practice Act provides in part:

"(1) A plaintiff desirous of a trial by jury must file a demand therefor with the clerk at the time the action is commenced. A defendant desirous of a trial by jury must file a demand therefor not later than the filing of his answer. Otherwise, the party waives a jury."

Section 59 of the Civil Practice Act provides in relevant part:

"On good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment."

Supreme Court Rule 183 provides:

"The court, for good cause shown on motion after notice to the opposite party, may extend the time for filing any pleading or the doing of any act which is required by the rules to be done within a limited period, either before or after the expiration of the time."

■■  The strong policy of this State as expressed in article I, section 13, of the Illinois Constitution of 1970 is to favor jury trials, and the Illinois Supreme Court has ruled that the power of the legislature to regulate the right of jury trial should be liberally construed in favor of the right to a jury trial. (*Hudson v. Leverenz* (1956), 10 Ill. 2d 87; *Stephens v. Kasten* (1943), 383 Ill. 127.) However, the defendant argues the plaintiff offered no evidence of "good cause" as required by section 59 and Supreme Court Rule 183 and relies on the majority opinion in the case of *Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d 254. In that case the court

found the plaintiffs were not entitled to a jury at the time of trial when the defendant withdrew its demand because of a need for systematic order of procedure as provided for in section 64 of the Civil Practice Act. The court concluded the plaintiffs had suffered no unfairness because they were in full control of the litigation when they commenced their suit and failed to demand a jury.

We must respectfully disagree with the rationale of the majority opinion, and we conclude the reasoning of the dissent, which takes the practical realities into consideration, is more persuasive. It points out that a plaintiff must weigh his desire for a jury against the added delay of at least two years which is required for a jury trial. As in the instant case where the plaintiff has been severely injured, a speedy conclusion of the litigation is of great importance and may take precedence over the desirability of having a jury decide the factual issues. If the defendant is allowed to waive the jury immediately prior to trial, the effect is to frustrate both the plaintiff's desire for speedy litigation and his desire for a jury, while the defendant gains both his objectives of delay and a bench determination of the issues.

Every experienced attorney and trial judge knows how and why these delays come about and cause backlogs on the circuit court jury calendar, and it is an imposition on the plaintiff to be denied a jury after waiting and preparing for it for four years.

It is clear there would have been no prejudice to the defendant by allowing the motion, and in the case of *Department of Public Works & Buildings v. Melling* (1966), 78 Ill. App. 2d 37, 41, the court stated:

> "The rule is well settled in Illinois that a trial court should not deny the right to a jury trial when there is no showing of inconvenience to the court or to the parties-litigant or prejudice to any rights in any manner whatsoever, and that trial by jury is a favored mode of trial."

In addition allowing the defendant to make his withdrawal of the demand after a discussion of trial related issues allows the defendant the advantage of opting for a bench trial if the preliminary rulings of the court appear to be favorable to his cause. In this case the court ruled against the defendant on the narrow issue involved, but his comments may have encouraged the defendant as to the ultimate disposition of the case. We hold it was an abuse of discretion to deny the plaintiff an opportunity for a jury under these circumstances.

The plaintiff next contends the judgment of the court in favor of the defendant was against the manifest weight of the evidence. At the close of the plaintiff's case the defendant made a motion for judgment in that the plaintiff failed to sustain his burden of proof with respect to one or more of the following issues: (1) that the defendant was in charge of work being

performed by the plaintiff; (2) that the plaintiff fell from a scaffold which was in the charge of the defendant; (3) that the scaffold was defective within the meaning of the Act; and (4) that the injuries sustained by the plaintiff were occasioned by a wilful violation of the Structural Work Act.

In finding for the defendant the court stated:

"I don't know about Miller, what he was doing, but—or his employees, this Plaintiff came on the job site, having left the platform or left the scaffold unfinished, he went up on the second floor and jumped on the platform or on the scaffold, and something happened.

No indication he was told to go up there, there is no indication what he was going to do up there, no indication as to whether his foreman, his immediate superior, had told him to go up there to start lifting something or doing something.

He had his coffee, which he had a right to do, walk on and jumped on that platform, and all of a sudden, it came down on him.

Now, to hold the Defendant liable in this case, would be tantamount to each general contractor, as I say, setting up such protective devices which would be the same as assigning a separate watchman to each employee to make sure that he didn't trip over a two by four or fall off of something, even though obviously, it wasn't willful on Mr. Hernandez' part, but I think that the reasonable supervision of this job site, was not negative, by anything that was done by the Plaintiff's testimony or that was introduced by the Plaintiff's testimony, I agree with the experts that all of the safety things should be done, no question about that, but I could not find liability on the part of the Defendant, because there was no showing that a dangerous condition exists, no showing that the scaffold was in fact completed, and had that worker—that workers were using it.

I mean there is the fact that there was a wheelbarrow, and a couple of mortar boards thrown up for—or put up there or somehow propped up there is not an indication it was being used, there is nothing showing that there was any brick work being done for whom the scaffold was being erected, or that they were going to work that morning until some other time. I don't know."

The rationale of the trial judge was apparently that the plaintiff was not entitled to the protection of the Structural Work Act because he brought injury upon himself by jumping down on an unfinished scaffold without being ordered to work on it. Such a conclusion is manifestly erroneous and not supported by the law or the evidence.

■■ The purpose of the Structural Work Act (Ill. Rev. Stat. 1971, ch. 48, pars. 60 through 69) is to protect men working in dangerous

occupations (*Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156; *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305), and it has been held that a liberal construction of the Act is necessary to carry out the clear purpose of the legislature to afford broad protection to working men. (*Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494; *McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146.) In this case the evidence was sufficient to establish that the scaffold was defective, the defendant was in charge of the work, and either knew or should have known of the dangerous condition.

There is no doubt that at the time the plaintiff was injured, the scaffold was defective as measured against the specific provisions of local ordinance, and the standards of the industry.

Portions of the National Building Code, 1967 edition, adopted by the village of Winnetka, and the Manual of Accident Prevention, published by the Associated General Contractors of America were read into evidence. They provide for the construction of guard rails and toe boards. Edward Stevenson, a construction safety supervisor for the Illinois Department of Labor, testified it was the custom and practice in the industry in 1968 to construct guard rails and that planking must be cleated to both ends of the scaffold so that it cannot come off the braces.

Louis S. Jacobs, a consulting architect and engineer and associate professor in architecture, engineering and technical services at Loop College, testified to the necessity of those same devices and also indicated the necessity of providing ladders.

Contrary to the opinion of the trial court the evidence does not support the conclusion that the scaffold was merely unfinished or that the plaintiff was acting on his own initiative to begin work. The plaintiff testified he was told by his foreman the scaffold would be complete when he arrived and he was to supply the scaffold so the bricklayers could begin work by 8 o'clock. He knew from his experience on the job a completed scaffold was one in which planks had been placed on the tubular frame. He had never been told to construct guard rails, mid-rails or toe boards nor had he done so on any of the scaffolds he constructed on that job site. He also testified he had supplied brick and mortar to scaffolds without those safety features. The fact that there was a wheelbarrow already on the structure is corroborative of this testimony. The trial judge's statement that there were no workers using the scaffold ignores the fact that no bricklayers could begin until the plaintiff had done his job. It also assumes the plaintiff is not himself a worker who is protected by the Act.

Section 9 of the Act (Ill. Rev. Stat. 1971, ch. 48, par. 69) places liability on all those having charge at the time of the injury, and in the case of *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, the court construed the meaning of having "charge" to include all those who have

actual control or who retain the right to control the work:

> "Rather consistent with its beneficial purpose of preventing injury to persons employed in the extra-hazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure."

Also see *Miller v. DeWitt* (1967), 37 Ill. 2d 273, where the court found the architects to be in charge because they retained the right to stop work if it was being done in an unsafe manner.

■■ Under this broad definition of being in charge, the evidence establishes the defendant, a general contractor, was in charge of the work at the time of the injury. Prior to the commencement of the trial, while arguing a motion to exclude from evidence the terms of the general contract between the owner of the property and the defendant, counsel for the defendant admitted his client was the general contractor and had overall supervision of the construction project. George Erda testified he was the representative of the contractor on the job, and if the work was sloppy, inadequate or unsafe, he had the authority to insist on the correction being made. He constantly made rounds to see that all the work was being performed in a satisfactory manner.

In addition, in the contract between the defendant and the board of education the defendant specifically agreed to be responsible for the acts and omissions of all subcontractors and their employees; agreed to be responsible for initiating, maintaining, and supervising all safety precautions and practices; and agreed to adhere to all applicable laws, ordinances, rules and regulations of any public authority having jurisdiction for the safety of persons and property.

■■ ■ There was also ample evidence the injury was caused by a wilful violation of the Act. For the purposes of the Act, "wilful" means that all persons having charge of the work are liable not only where dangerous conditions are known to them, but also when by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known to them. *Kennerly v. Shell Oil Co.* (1958), 13 Ill. 2d 431; *Assise v. Dawe's Laboratories, Inc.* (1972), 7 Ill. App. 3d 1045.

Louis S. Jacobs testified it was the custom and practice for a general contractor to have the responsibility to see that all scaffolding on the job site is properly erected and to see that there are guard rails, mid-rails and ladders and that planking is securely fastened. He stated the foreman or superintendent of the project should check every part of the job upon

completion of each day's work to determine what has to be done the following morning and what conditions are unsafe.

In contrast to that standard George Erda testified he knew he was required to conform to the statutes, ordinances, rules and regulations of the municipality and of the state in which he worked, but he did not investigate to determine what code he was operating under in Winnetka and did not know that it had adopted the National Building Code which provides for the construction of guard rails and toe boards. Although he immediately checked scaffolding put up by the Power Construction Company to see that it was erected properly, he considered the subcontractors to be responsible for the safety of their own men. If he happened to pass a scaffold that was put up by a subcontractor which had a glaring error, he would bring it to the attention of their superintendent or foreman.

■■ Finally, the trial court's apparent conclusion the plaintiff had brought the injury on himself is not a relevant factor to be considered under the Act even if it had been shown to be true. In the case of *Lindsey v. Harlan E. Moore & Co.* (1973), 11 Ill. App. 3d 432, the court said:

> "Contributory negligence and assumption of risk are not defenses to an action brought under the Structural Work Act. This Act was adopted to permit recovery by persons employed in dangerous and extra-hazardous occupations regardless of the manner of doing their work."

Also see *Bryntesen v. Carroll Construction Co.* (1963), 27 Ill. 2d 566.

■■ The plaintiff's last contention is that the court erred in excluding expert testimony. Edward Stevenson was asked a hypothetical question setting forth the facts of this case and was requested to give his opinion as to whether appropriate guard rails and toe boards affixed to the scaffolding could have prevented a person from falling off the scaffold. The defense counsel objected and the court sustained the objection based upon a characterization of the question as "the ultimate issue before the court." Even though we do not deem this question to go to the ultimate issue, it is now well settled in Illinois that experts may express opinions even on ultimate issues based on the theory that the trier of fact is not required to accept the opinion. *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118; *In re Roberts Park Fire Protection District* (1974), 20 Ill. App. 3d 282. Also see *Schroeder v. C.F. Braun & Co.* (7th Cir. 1974), 502 F.2d 235.

While the exclusion of such testimony might not ordinarily be considered to be prejudicial, the expert's opinion may have altered the court's erroneous determination that only a separate watchman for each employee could prevent injuries in the circumstances which prevailed in this case.

For these reasons, the judgment of the Circuit Court of Cook County is reversed and the case is remanded for a new trial, with directions to grant the plaintiff a jury trial.

Reversed and remanded with directions.

JOHNSON, P. J., and ADESKO, J., concur.