JAMES GREENE, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO *et al.,* Defendants-Appellants.

First District (2nd Division)    No. 60853

Opinion filed November 30, 1976.—Rehearing denied February 7, 1977.

DOWNING, J., dissenting.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel R. Pascale and Peter Fitzpatrick, Assistant Corporation Counsel, of counsel), for appellants.

Herbert F. Stride, Ltd., of Chicago (William J. Harte and Martin J. Healy, Jr., of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

A judgment of $750,000 was entered in favor of James Greene by the court without a jury in this personal injury action against the City of Chicago and Timothy J. Ferm. Timothy J. Ferm was charged with negligence in driving his automobile and the City of Chicago with negligence in maintenance of artificial street lighting. Only the City prosecutes this appeal.

On December 12, 1970, at approximately 11:30 p.m., plaintiff James

Greene was proceeding south on Wentworth Avenue. Just north of the intersection of 104th Street, plaintiff's car stalled. The weather was overcast, with rain turning to snow. After several attempts to restart the automobile failed, plaintiff switched on the emergency blinker and got out of his car. He went to the rear and proceeded to remove a flare with which he intended to light the area to warn other motorists. The evidence as to whether the street lights were on or off at the time is in considerable conflict and will be detailed below. The plaintiff was struck as he was standing behind his vehicle by an automobile driven by co-defendant Timothy J. Ferm. The injuries plaintiff received necessitated the amputation of both legs.

The issues on appeal are: (1) whether the finding that the artificial street lights were not lighted at the time of the occurrence was against the manifest weight of the evidence; (2) whether a municipality is liable for negligence in the maintenance of its voluntarily undertaken street lighting, apart from its generic obligation to warn travelers of dangerous obstructions to ordinary travel; (3) whether the defective condition of the artificial lighting was the proximate cause of the occurrence; (4) whether the notice served by plaintiff complies with the requirements of section 8—102 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1971, ch. 85 par. 8—102); and (5) whether it was error to deny the City's motion for leave to file a late jury demand.

The City's first contention is that the trial court's determination that the street lights were not functioning along Wentworth Avenue at the place of the collision is against the manifest weight of the evidence. The plaintiff alleges that the lights were out from 103rd to 107th. The City's evidence shows that the lights on Wentworth from 103rd to 107th consist of two circuits. Each starts from a junction box at 105th Street. One circuit runs north to a point 20 feet south of the south line of 103rd Street. The other circuit runs south from the same junction box to a point just north of the north line of 107th Street. All the lights are located on the west side of the street. Each circuit is separate from the other. Each has a separate circuit breaker. Both circuits receive their electricity from the Commonwealth Edison pole at 105th Street just west of Wentworth Avenue. The circuits of street lights for the streets intersecting Wentworth running east and west are entirely independent from the circuit that serves Wentworth Avenue.

On direct examination in its defense testimony, the City produced several witnesses who testified as to the procedure followed by the Bureau of Streets and Sanitation with regard to street light maintenance. Testimony established that the City is prepared to receive complaints about street light malfunction on a 24-hour basis. The complaints may be

received from citizens via the telephone, or from City mobile units equipped with two-way radios. In addition to the City units, police officers regularly report light failures which they observe. Police reports are collected at police headquarters at 11th and State Streets and are then passed on to the Bureau via a special telephone "hot-line."

Upon receiving a complaint from either a citizen or from a city source, a record card is prepared which contains all of the pertinent information. In addition to these, the City then teletypes the information directly to the load dispatcher at the Bureau of Electricity so that a work crew may be sent to investigate and correct the light malfunction. Once the dispatcher receives the information, he prepares a defect report. Each report has provisions for up to 30 serially numbered complaints. In turn the information is then sent to the district office which covers the area of the malfunction. It is from these district offices that work crews are dispatched.

The Bureau of Electricity, once it has received a report of a street light failure, then prepares several of its own reports which make up a record of all maintenance measures taken. These records are further supplemented by each work crew which maintains its own log as to the work done on the street system.

The City presented evidence that it had no record of either a complaint about, or of repairs made to, the street lights on Wentworth Avenue between 103rd and 107th Streets on or about December 12, 1970.

The City also presented a number of police officers who had occasion to make out accident reports as to accidents which had occurred in the area on the evening of December 12, 1970. They testified that, on that evening, the street lights in the area were on. Only one of these officers was able to testify that he specifically remembered that the lights were functioning on the night of the accident. The other officers stated that they had no independent recollection of the matter and relied on their accident reports.

The plaintiff produced five persons who testified that, on the night of the occurrence, the street lights along Wentworth Avenue in the 103rd and 104th blocks of South Wentworth Avenue were off. Artie Johnson, who resided at 10340 South Wentworth, stated that, as he left his house, he noticed a crowd gathering at the intersection of 104th and Wentworth. As he approached the scene, he realized there had been a traffic accident. Mr. Johnson further stated that the street lights were off on the night of the accident and that they had been off for three weeks prior to the date of the occurrence. Mr. Johnson testified that he had called the City to complain about the lights before the accident. Dorothy Driggers, who lived at 10406 South Wentworth, testified that on December 12, 1970, she was startled by a loud noise outside of her house. When she went out to

investigate, she saw the plaintiff lying on the street. She testified that the lights were not on at the time of the occurrence and had been off for some period before that, and also that the service had been intermittent for several weeks. She also stated she called the City to report the light failure. Clarence Whittaker, who resided at 10410 South Wentworth, testified that he was aroused by a loud crashing sound and that, when he went to see the source of the noise, he was unable to do so because the street lights were out. He also testified that the street lights had been malfunctioning for quite some time before the accident.

The Reverend Theodore Harrison testified that he had been driving directly behind the co-defendant, Timothy J. Ferm, for several blocks. He stated that he was proceeding south on Wentworth when he came to 103rd Street, where they both stopped for a traffic light. As he passed the intersection the overall visibility suddenly dropped from about 150 feet to 25 feet because the overhead lights had failed. Reverend Harrison said it was so dark that, when Mr. Ferm's automobile suddenly swerved and stopped, he had to get out of his car to see with what Mr. Ferm had collided.

Mr. Ferm, the co-defendant, testified that, when he crossed the intersection at 103rd, the overhead lights were not burning south of that point. He stated the visibility was reduced from 150 feet to only about 50 or 60 feet. It was this reduction in visibility that made it difficult for him to see the plaintiff's stalled car. Mr. Ferm testified that he did not see the plaintiff's car until he was about 60 feet from it and, even then, because of the darkness, he could not tell that the plaintiff's car was stationary.

■■ When the court tries a case without a jury its findings of fact should not be disturbed unless those findings are against the manifest weight of the evidence. (*C. A. Aderdung Plumbing & Heating Co. v. Stanton* (1969), 115 Ill. App. 2d 308, 253 N.E.2d 160; *Upton v. Parkway Motors, Inc.* (1968), 90 Ill. App. 2d 426, 232 N.E.2d 513.) Where the record and evidence support the findings of the court those findings should not be disturbed. (*Turner v. Board of Education* (1973), 54 Ill. 2d 68, 294 N.E.2d 264; *Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518; *Bridges v. Neighbors* (1975), 32 Ill. App. 3d 704, 336 N.E.2d 233.) The trial court is in a better position to assess the credibility of the witnesses and to weigh the conflicts in evidence. In our opinion the trial court's finding of fact that the lights were off is supported by the evidence and should not be disturbed.

The finding of fact that the lights were not functioning on the night of the plaintiff's injury leads to the defendant's second contention which essentially questions the scope of the duty of a municipality under the circumstances. The City contends its only duty is to provide lighting where there are known dangers or obstructions in the street. The City

cites *Ricklefs v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1954), 1 Ill. App. 2d 320, 117 N.E.2d 573, in support of this position. In *Ricklefs* the court reviewed the leading cases and said, at page 329, "So far as we have been able to determine, the cases go no further than to require the City to light and warn against known dangers or obstructions." The plaintiff concedes that a municipality is not legally required in the first instance to install lights except when there is a dangerous obstruction or defect in the road. However, the plaintiff argues that, where a municipality does in fact undertake to light its streets, it may be liable if it does so in a negligent manner. In support of this conclusion, the plaintiff cites the cases of *Baran v. City of Chicago Heights* (1969), 43 Ill. 2d 177, 251 N.E.2d 227; *Johnston v. City of East Moline* (1950), 405 Ill. 460, 91 N.E.2d 401; *City of Chicago v. Powers* (1866), 42 Ill. 169; *City of Chicago v. Kubler* (1907), 133 Ill. App. 520; and *Ricklefs.* An examination must be made of these cases to determine what the duty is.

In *Kubler*, the plaintiff was driving a team of horses attached to a wagon along Erie Street when the wheel of the wagon slipped into a hole that the wagon driver could not see because of the dimly lit street. The court found the city negligent in allowing the roadway to remain in a bad condition and in not providing sufficient light to enable the defects to be seen by those using the street. The plaintiff cites that case for what the court stated at page 526:

> "Here the dereliction of the city is accentuated from the fact that while it understood the duty of furnishing light, it did so inadequately."

In *Powers*, plaintiff fell into the Chicago River and drowned at an open swing-type bridge on Clark Street. The court said the bridge was part of the street and that it was as much the city's duty to light the bridge as any other portion of the street. In *Johnston*, a traffic light at one corner of the intersection was inoperative for five days. Plaintiff was injured when the driver of another car entered what he thought was an unmarked intersection and struck the plaintiff's car while it was proceeding on a green light. Plaintiff cites that case for what the court said at page 468:

> "* * * Justice and reason, however, impel us to the conclusion that after the signal system in question was constructed and in operation, the keeping of it in such condition that it would not inevitably be hazardous and invite citizens into danger was a corporate duty, for the failure of which liability was incurred."

In *Ricklefs*, the plaintiff was injured by a motor vehicle in an underpass that was not well lit. There were no pedestrian walkways in the underpass. The court noted that the lighting system in the underpass was not intended to illuminate the roadway but rather merely to provide an outline of the roadway for automobiles using the underpass. Because the

city had not intended to light the street when it installed the fixtures, the court reasoned that the failure of many of the light bulbs could not possibly have been the proximate cause of the injuries which the plaintiff claimed. This being the case, the city had never assumed any duty to provide illumination of the roadway for either pedestrians or motorists. The court nevertheless cited with approval several cases, including *Johnston v. City of East Moline*, holding that, once a city undertakes to light its streets, it is bound to see that it does so in a reasonably safe and skillful manner.

In *Baran*, the City of Chicago Heights was found liable because it elected to install a lighting system which was defective in that it created a condition which prevented the plaintiff from seeing that the street on which he was driving ended in a "T" intersection. Because of the defect the plaintiff went through the intersection and struck a tree. The court said at page 180:

> "The court has long recognized that where a city undertakes to provide lights, it is liable for injuries which result from deficient or inadequate ones. [Citations.] In holding a city responsible for injuries thus caused the court is not reviewing the city's discretion in selecting a plan.
>
> It is not controlling or passing upon the city's estimate of public needs. Nor is it deciding what the "best" kind of improvement may be. It is simply saying that when a city creates a hazardous condition and someone is injured as a consequence it must respond in damages * * *."

Finally, the court concluded:

> "The rule which protects [the city] in the exercise of its governmental function should not be construed to relieve [it] from liability when the plan devised, if put in operation, leaves the city's streets in a dangerous condition for public use."

In *Kubler* and *Powers*, the city did not voluntarily undertake to provide street lights. The duty to provide lights in each instance arose because the roadways had known dangers or obstructions in them. In the former case the roadway had a hole, the magnitude of which required a warning; and in the latter case, the bridge, which the court found was a part of the road, when opened created a hazard that required a warning either by lights or barricades. In both of those cases defendants failed to give adequate warning as to known dangers or obstructions in the street and consequently failed to discharge a duty. In *Baran* and *Johnston*, the cities had voluntarily undertaken to light the streets in the one case and to install traffic control signals in the other, and then either installed or maintained the facilities negligently. In *Johnston*, the city voluntarily installed traffic control signals and thereby assumed the duty of reasonable maintenance;

when one failed, its failure created a situation that was inevitably hazardous and invited citizens into danger, a situation of which the city either knew or reasonably should have known. Again, in *Baran*, the city voluntarily undertook to install street lights, and the court found that the installation itself created a hazardous condition for which the city had to respond in damages.

We believe that the Restatement (Second) of Torts §323 (1965) is applicable (see *Indian Towing Co. v. United States* (1958), 350 U.S. 61, 100 L. Ed. 48, 76 S. Ct. 122), and reflects the case law in Illinois.

> "One who undertakes, gratuitously or for consideration, to render services for another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm * * *."

■■ We believe there is ample evidence from which the court could find that the failure of the lights at the scene of the occurrence increased the risk of harm. The plaintiff testified that, as he proceeded south on Wentworth, the visibility was 200 to 300 feet. However, as he crossed the intersection of 103rd Street, he entered into an area where the visibility dropped to 25 to 50 feet because the overhead lights were out. Reverend Harrison testified that, as he drove on Wentworth at 103rd Street, the visibility decreased from 150 to 200 feet to about 25 feet. He further testified that, as he entered the darkened area, he was forced to stop suddenly because the car in front of him swerved to the right and came to a halt. The witness went on to say that something was lying on the ground directly in front of his car, but due to the darkness he could not see what it was. The co-defendant, Timothy J. Ferm, testified that, upon entering the darkened area, he could only see about 50 feet. He further testified that, when he first realized the car was in front of him, he thought it was moving. Due to the darkness it was too late to avoid the plaintiff's car when he finally realized that it was not moving. According to several witnesses who resided in the area, the lights had been off for some period of time. There was sufficient evidence for the court to find that this suddenly dark stretch of road on an otherwise well-lit major thoroughfare, and the City's failure to correct that condition, which was or reasonably ought to have been known to it, increased the plaintiff's risk of harm and that the City was therefore negligent.

The City asserts that, even if the lights on Wentworth Avenue were not in fact lighted, the absence of artificial lights was not a proximate cause of plaintiff's injuries. The definition of proximate cause is contained in Illinois Pattern Jury Instructions, Civil (2d ed. 1971), and in *Kinsch v. DiVito Construction Co.*, 54 Ill. App. 2d 149, 154, 203 N.E.2d 621, and is

as follows: " '[Proximate cause is] that cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. (IPI No. 15.01)'."

■■ The City says that plaintiff's flashing red lights were on and noticeable on a dark street without lights and that this should have been visible for one block. The City asks whether the law should require the City to anticipate: (a) that the plaintiff would have a failure of his automobile, so that it would stall at this point on Wentworth Avenue; (b) that he would get out of his vehicle and stand to the rear of it, facing away from the oncoming traffic; and (c) that Ferm would be driving on the same street in such an intoxicated condition that he would be unable to see the flashing red lights of the plaintiff's automobile? The City argues circumstances from the cases of *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 317 N.E.2d 665; *Storen v. City of Chicago* (1940), 373 Ill. 530, 533, 27 N.E.2d 53; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 308 N.E.2d 617; and *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 12, 310 N.E.2d 1, essentially for the propositions that an act is not the proximate cause of the injury if the defendant could not have anticipated its occurrence or if the occurrence was not objectively reasonable to expect. Those propositions of law are adequately stated by the City, but an examination of those cases, which were decided on their individual facts, does not aid in our determination of the facts in this case. The question remains, was this action foreseeable, that is, objectively reasonable to expect? In our opinion it was. There is testimony in the case that lights are erected for the purpose of insuring the safety of motorists and pedestrians. We believe it was objectively reasonable for the City to expect a dangerous situation would be created if, when it knew or should have known that its street lights were out on portions of an arterial street that was otherwise well lit, it then permitted those lights to remain out and failed to give any warning to motorists. It is not necessary that the City have been able to foresee the precise nature of the occurrence or of the concurrent cause (Ferm's conduct). (*Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497; *Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 311 N.E.2d 128.) Moreover, the question of proximate cause, where, as here, reasonable men may arrive at different conclusions, is a question of fact for the trier of facts. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.) The evidence was more than sufficient for the trial court to find that the failure of the street lights on Wentworth Avenue was a proximate cause of plaintiff's injuries.

The City next contends that the suit must be dismissed for failure to give notices required under section 8—102 of the Local Governmental

and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1969, ch. 85, par. 8—102) which in pertinent parts reads as follows:

"Within six months from the date that the injury or cause of action * * * accrued, any person who is about to commence any civil action for damages on account of such injury against a local public entity, * * * must personally serve * * * a written statement, signed by himself, his agent or attorney, giving the name of the person to whom the cause of action has accrued, the name and residence of the person injured, the date and about the hour of the accident, the *place or location where the accident occurred*, the general nature of the accident, the name and address of the *attending physician, if any*, and the name and address of the treating hospital or hospitals, if any." (Emphasis added.)

The alleged defects in the notice were that the location of the accident was listed as "105th and Wentworth," instead of the actual intersection of 104th and Wentworth, and, additionally, that the name of the attending physician was not given. With regard to the first alleged defect, in the case of *Meisenheimer v. City of Chester* (1973), 15 Ill. App. 3d 1088, 305 N.E.2d 322, the appellate court reversed a dismissal based upon an allegedly defective notice. Plaintiff there stated that the accident occurred on "Route 3 in Chester, Illinois." Route 3, as the defendant pointed out, ran the entire length of the City, and it was argued that this notice was not specific enough to enable the defendant to investigate the plaintiff's claim. The appellate court held that plaintiff had substantially complied with the statute because the City had received actual, as well as statutory, notice of the exact location of the accident.

■■ In the case at bar, the City had actual notice that the accident occurred at 104th Street from police reports which recorded the facts of the mishap. With these reports and by the exercise of some diligence the defendant was able adequately to investigate the accident. Plaintiff's written notice and the fact that the City had actual notice of the place of occurrence demonstrate substantial compliance with the statute on the part of plaintiff. *Meisenheimer v. City of Chester; Reynolds v. City of Tuscola* (1971), 48 Ill. 2d 339, 270 N.E.2d 415; *King v. Johnson* (1970), 47 Ill. 2d 247, 265 N.E.2d 874.

■■ As for defendant's second alleged defect, we find that plaintiff was again in compliance with the statute. Plaintiff contends that the reason he failed to list an attending physician was, not simply that he did not know the identity of the attending physician, but that in fact he did not have one as such. A review of the record supports this contention. Plaintiff was treated at Cook County Hospital by the orthopedic staff. He was attended by a battery of physicians during his hospitalization.

Moreover, we note the following: (1) His testimony that he did not in fact have any attending physician as such was not contradicted by the City; (2) The notice statute requires only that he include the name and address of the attending physician, "if any"; and (3) when he supplied the name of the treating hospital, this was enough information to enable the City to obtain the necessary medical data to make its investigation. (*Bickel v. City of Chicago* (1975), 25 Ill. App. 3d 684, 323 N.E.2d 832.) We, therefore, deem this notice to be sufficient.

The last contention of the City is that the court abused its discretion in denying the City's motion for leave to file a late jury demand. Two and one-half years after suit was filed, the City changed trial counsel and requested a jury. This request was denied. The procedure for filing a jury demand is contained in the Civil Practice Act, Section 64. (Ill. Rev. Stat. 1973, ch. 110, par. 64.) That section provides that a defendant desirous of a trial by jury must file a demand not later than the filing of his answer.

The Civil Practice Act, section 59 (Ill. Rev. Stat. 1969, ch. 110, par. 59), provides that, on good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment. Supreme Court Rule 183 (Ill. Rev. Stat. 1969, ch. 110A, par. 183) provides that for good cause shown the court may extend the time for doing any act, which is required by the rules to be done within a limited period, either before or after the expiration of the time. The affidavit filed by the City in support of its motion in the trial court stated that present trial counsel was first retained in January of 1974 and that, on his review of the file, it was apparent to him that there were serious questions of fact which should be determined by a trial by jury. In oral argument before the trial court, it was asserted that there would be neither inconvenience nor prejudice to the rights of the plaintiff because, with or without a jury, the defendant was then ready to go to trial. In fact, the case did not go to trial until 3½ months after defendant's motion was denied because of some extensive discovery by the plaintiff.

In *Hudson v. Levernz* (1956), 10 Ill. 2d 87, 139 N.E.2d 255, the plaintiff filed suit on March 3, 1954. The various defendants filed answers, the final pleading being filed on September 2, 1954. There were no requests for a jury trial. When both parties were present, the matter was set on a nonjury calendar in December of that year. Early in December, one of the defendants filed a jury demand alleging misapprehension of the facts, mistake, and inadvertence. Plaintiff replied that all the parties were aware that the matter was set for a nonjury call and that he would be prejudiced in the filing of a jury demand because it would set the matter over to a subsequent jury calendar. The trial court denied the defendant leave to file a jury demand and proceeded to trial on the date originally scheduled.

The Supreme Court in affirming the trial court noted that all parties were present when the matter was set on the nonjury docket and it was not until some two months later and only a few days before the trial that the request was made to file the jury demand. The court noted that the defendants did not advance any reason or "good cause" other than to say their failure resulted from "misapprehension of facts, mistake and inadvertence." Based on these facts the court stated that the defendants failed to comply with section 64 of the Civil Practice Act and did not show why their failure should be excused under section 59 of the Civil Practice Act and Rule 183 of the Supreme Court Rules.

The City cites the leading case of *Stephens v. Kasten* (1943), 383 Ill. 127, 48 N.E.2d 508 for the proposition that the trial court should have allowed the filing of a late jury demand, in the exercise of its discretion in the protection of the jealously guarded right to a trial by jury, if it appears that the filing of such a jury demand does not tend to inconvenience the court or the parties litigant. The *Hudson* court, in distinguishing *Stephens*, noted that the attorney who neglected to file the jury demand on behalf of the appellant really represented the insurance company and not the appellant, and did not effectively waive the appellant's right to a jury trial. The effect of the holding in *Stephens* was that, under those circumstances, the appellant had shown good cause why he should be protected in respect of his right to have a jury trial.

■■ We fail to see "the good cause shown" in the case at bar. Inadvertence or mistake does not constitute good cause, nor does mere absence of prejudice to the plaintiff and of inconvenience to the trial court equate to "good cause shown." Obviously the rule is not to be circumvented by retaining new trial counsel. The affidavit of counsel does not show why the failure of his predecessor should be excused. The trial court's denial of the motion was a reasonable exercise of sound discretion which is vested in the trial court. *Johnson v. Sabben* (1972), 7 Ill. App. 3d 238, 282 N.E.2d 476.

Judgment affirmed.

HAYES, J., concurs.

Mr. JUSTICE DOWNING, dissenting:

I would reverse this cause due to the failure of the trial court to grant the City a jury trial. In my opinion the cause should be remanded for a new trial before a jury.

## I.

At the outset I recognize that this issue must be resolved by determining whether the trial court abused its discretion when it denied the City's

motion for a jury trial after the City failed to file a jury demand in accordance with section 64 of the Civil Practice Act. Based on the facts and circumstances of this case I think the denial of the motion was a clear abuse of discretion.

The complaint was filed August 3, 1971. The City filed its answer September 23, 1971. No jury demand was then filed by the City as was required by section 64. The case worked its way through the customary delay awaiting its turn for trial. Then on February 11, 1974, the City, by its then recently retained special counsel, filed its motion for leave to file a jury demand.[1] This verified motion asserted the oversight of the assistant corporation counsel in failing to file a jury demand; that special counsel was employed January 14, 1974 (obviously as the case was approaching trial); that an appearance was filed January 29, 1974; that because of serious questions of fact it was then determined a jury trial was desirable to protect the rights and interests of the litigants; and that no inconvenience or prejudice to plaintiff's rights would result by granting the motion. It is to be noted that there was no request by the City to delay the proceedings. On February 11, 1974, the trial court granted the City leave to file a jury demand instanter. Thereafter on February 25, 1974, the trial court vacated its order granting the City leave to file a jury demand, and then denied it. The record contains only a handwritten order asserting that the February 11, 1974, order had been granted in the absence of counsel for plaintiff and upon objection tendered by counsel for the plaintiff, the trial court after hearing arguments entered an order of vacatur and denial. The case did not proceed to trial until June 3, 1974, at which time the trial court again denied the City's renewed motion for a jury trial.

Article I, section 13, of the Illinois Constitution of 1970 provides that the right of trial by jury as heretofore enjoyed shall remain inviolate. This right to a jury trial has been guaranteed in Illinois since the State has been organized.

Section 64 of the Civil Practice Act requires affirmative action by a party in order to obtain a jury trial. This procedure was sustained as against constitutional objections in *Stephens v. Kasten* (1943), 383 Ill. 127, 48 N.E.2d 508. Section 59 of the Civil Practice Act and Supreme Court Rule 183 both provide, upon good cause shown, for the granting of an extension of time for any act either under the practice act or rules.[2]

In *Stephens* our supreme court said, "[c]ourts zealously guard the right of a person to a trial by jury." (383 Ill. 127, 133.) The supreme court pointed out that the late filing of a jury demand should be allowed if it

---

[1] The verified proof of service in the record indicates a copy of the motion was served on plaintiff's attorneys by mail on February 6, 1974.

[2] See *Hernandez v. Power Construction Co.* (1976), 43 Ill. App. 3d 860, 357 N.E.2d 606.

does not tend to inconvenience the court, parties litigant, or prejudice parties' rights in any manner whatsoever, 383 Ill. 127, 135.

In discussing the payment of a fee upon the filing of a jury demand, in *Morrison Hotel & Restaurant Co. v. Kirsner* (1910), 245 Ill. 431, 433, 92 N.E. 285, our supreme court said, "* * * the cherished right of trial by jury shall remain inviolate, the statute should be liberally construed in favor of the right and the inclination of the court should be to protect and enforce the right."

In the case at bar I think there was good cause shown for the late jury demand. The answer of the City was signed by an assistant corporation counsel. It is a matter of common knowledge that the corporation counsel's office is large with many assistants. Regardless, as the case became ripe for trial, the City retained an able, experienced special counsel. Within 30 days after his employment as special counsel, a verified motion for a jury trial was filed. Special counsel asserted under oath "* * * that there were serious questions of fact which could most fairly and adequately be determined for both the plaintiff and the defendant by a jury * * *." *There is no denial of this assertion in the record.* Likewise, the special counsel claimed there would be no inconvenience or prejudice to plaintiff's rights by granting the motion. *That is undenied.* In fact the bench trial did not commence until over three months later.

In my opinion the record is clear that the late jury demand would not, and did not, inconvenience the court, parties litigant, or prejudice the rights of anyone in any manner whatsoever. If the right to a jury trial should be liberally construed, as set forth in *Morrison Hotel,* and if the guideline of *Stephens* is to have any meaning, then the City should have been granted a jury trial. To deny the City a jury trial under the facts and circumstances in my opinion was a clear abuse of discretion. It is my opinion that any trial court should, under these circumstances, gladly afford any party the constitutional right to a jury trial. *Cf. Wenban v. Weiner* (2d Dist. 1974), 23 Ill. App. 3d 561, 563, 319 N.E.2d 580.

The majority opinion cites *Hudson v. Leverenz* (1956), 10 Ill. 2d 87, 139 N.E.2d 255. There is a clear distinction between the facts in *Hudson* where the plaintiff claimed it would be inconvenienced by a delay, which claim was not disputed in the record. There is no such claim in the instant case.

For these reasons I would reverse and remand for a new trial.

## II.

I also disagree with the reference in the majority opinion to the Restatement (Second) of Torts §323 (1965). I do not believe that section applies to the facts and circumstances of this case. There is nothing that I

can find that suggests that the services referred to in this section either include or are comparable to the maintenance by a municipality of its street lighting. My reading of section 323 leads me to conclude it has no applicability to this set of facts.

## ORDER DENYING REHEARING

The petition for rehearing is denied.

HAYES and JIGANTI, JJ., concur.

Mr. PRESIDING JUSTICE DOWNING, dissenting:
I would grant the petition for rehearing for the following reasons:
(1) The failure of the trial court to grant the City of Chicago (City) a jury trial as set forth in my dissent to the majority opinion.
(2) The majority opinion holds the City liable because, having installed street lights, it was negligent in permitting the street lights to remain out even though the street itself was not inherently dangerous, nor did it have an obstruction or defective condition which contributed to the incident. *Baran v. City of Chicago Heights* (1969), 43 Ill. 2d 177, 251 N.E.2d 227, cited by the majority, is illustrative of the problem I have with the majority opinion. In *Baran,* the accident occurred at a "T" intersection with no signs, barricades, or reflectors to indicate the street terminated at the "T". The evidence was in dispute as to the adequacy of the illumination. Under those conditions, the supreme court said, " * * * when a city creates a hazardous condition and someone is injured as a consequence it must respond in damages, just as others are required to do." (43 Ill. 2d 177, 181.) As I read that language, the *hazardous condition* was the "T" intersection with no signs, barricades, or reflectors to warn a motorist of the hazardous condition. But there is no such hazardous condition in the case at bar. The only basis for imposing liability on the City was the fact that, having installed street lights, in was negligent solely for the reason that the evidence indicates—but not without persuasive dispute—the street lights were out. I would not extend the liability of the City to that extreme, nor do I think a fair reading of the cases relied on by the majority do so.
(3) The trial court's finding that the street lights were out at the time of the occurrence was contrary to the manifest weight of the evidence.
For all these reasons I would allow the petition for rehearing and reverse the finding of the trial court.