John B. Gannon, Appellee, v. Chicago, Milwaukee, St. Paul and Pacific Railway Company, Appellant.

Gen. No. 47,772.

First District, Third Division.

March 23, 1960.

Lord, Bissell, and Brook, of Chicago (Gordon R. Close and Richard E. Mueller, of counsel) for defendant-appellant.

Leonard M. Ring, of Chicago, for plaintiff-appellee.

JUSTICE FRIEND delivered the opinion of the court.

Plaintiff was employed as a bricklayer by E. H. Marhoefer, Jr., Company which was engaged in the construction of a trucking dock or terminal for the Chicago, Milwaukee, St. Paul and Pacific Railway Company, hereinafter referred to as the railroad, and was injured when he fell from a ladder while climb-

ing to a scaffold. He sued Marhoefer and the railroad under the provisions of the Structural Work Act [Ill. Rev. Stat. 1959, ch. 48, §§ 60–69]. The railroad answered, but Marhoefer filed a motion to dismiss on the ground that the Workmen's Compensation Act [Ill. Rev. Stat. 1959, ch. 48, § 138.5, subsection 5(a)—or 5(a) of the Workmen's Compensation Act] barred the action against it. The trial court sustained the motion, dismissed the action against Marhoefer, and indicated that the judgment was appealable under section 50(2) of the Civil Practice Act [Ill. Rev. Stat. 1959, ch. 110]. From this order plaintiff appealed directly to the Illinois Supreme Court on constitutional grounds. That court affirmed the judgment, holding that the Circuit Court had properly dismissed the complaint against Marhoefer (Gannon v. Chicago, M., St. P. & P. Ry., 13 Ill.2d 460). Thereafter the case proceeded against the railroad, based upon the civil-liability provisions of the Illinois Structural Work Act.

The complaint in paragraph 5 charged the railroad with wilfully failing to nail the ladder to the scaffold, wilfully failing to place the ladder on a secure footing, wilfully placing the ladder on water, ice or snow, wilfully failing or neglecting to place the ladder in a safe, proper, and suitable manner. The railroad's answer denied all charges of wilful misconduct. The jury answered in the affirmative a special interrogatory that the defendant knew or should have known of the alleged dangerous condition, and returned a verdict of $45,000, upon which the court entered judgment. Posttrial motions of defendant were overruled, and this appeal followed.

The salient facts disclose that from early September 1955, through November third of that year, the date of the accident, Marhoefer, pursuant to a contract with the railroad, was in the process of rebuilding a certain

trucking dock which had been partially destroyed by fire. This required the rebuilding of brick walls, and, accordingly, Marhoefer employed bricklayers. To carry out the operation, the usual and customary scaffolding and ladders were used. All the work—the bricklaying, the assembling and construction of the scaffolds, and the placement of the ladders—was performed by the employees of Marhoefer; and all the work was done under the supervision of Marhoefer employees. The railroad's engineers occasionally visited the job site to ascertain whether the work was progressing according to plans and specifications, and to check on the progress of the work, but exercised no supervision or control over the manner in which it was being done.

The scaffolds used by Marhoefer were constructed of metal tubing; they consisted of several sections which were assembled and reassembled by Marhoefer employees as the work progressed, for the purpose of reaching the top of the construction level. Marhoefer employees constructed the usual ladders, consisting of wooden two-by-fours with one-by-four rungs, and approximately fourteen to sixteen feet long. The particular scaffold involved in this occurrence consisted of two sections, each five feet high, which were fitted together to make a ten-foot scaffold. On the day of the accident, November 3, 1955, the weather was cold, the building was not yet under roof, and as a result the concrete floor of the building was icy and slushy in spots from previous precipitation. Plaintiff John Gannon, Miles Kilbane, and Donald Julian, all bricklayers employed by Marhoefer, had completed work on the north wall of the building and had moved the bricklaying operation to the south wall. A scaffold had been assembled that morning by Donatto Vitiello, a laborer employed by Marhoefer, for use by the bricklayers in building the south wall. After lunch, and just prior

to the accident, Gannon was assisting the Marhoefer foreman, Fleming Lyall, "shoot some points"; these points are guides or marks to aid bricklayers in establishing heights for the construction of doors and windows. Two of the bricklayers, Kilbane and Julian, were on top of the ten-foot scaffold and were awaiting the height marks they needed to continue laying bricks. George Wright, a laborer, was at the five-foot level of the scaffold to hand the bricklayers the necessary bricks and mortar as they worked. Vitiello had been requested to get a ladder, and about ten to twenty minutes before the occurrence he obtained and placed one against the scaffold, on an icy or slushy spot, but did not nail it to the scaffold. Kilbane, Julian, and Wright all used the ladder without difficulty; Kilbane even shook the ladder and found it in order. To shoot the necessary points, Gannon needed his small level for the purpose of transferring the points to the inside. While Lyall was talking to the bricklayers Julian and Kilbane, who were already on the scaffold, Gannon started up the ladder and, as he was about to step off onto the scaffold, the ladder began to slip; he fell to the floor with the ladder and was injured. Although the bricklayers testified to a custom of nailing ladders to scaffolds, none of the Marhoefer employees testified that they noticed that any of the ladders were nailed to the scaffolds by the Marhoefer employees on the job. Each of the ladders was moved from place to place as its use was required, and even though the ladders apparently were not nailed, each of the bricklayers used them without complaint. Gannon testified that he noticed that the ladder was in wet slush, but regardless of this knowledge he admitted that he did not check to see if it was nailed before using it, nor did he notice anything improper about the manner in which it was placed against the scaffolding. No employees of the

railroad were present on the job site at the time, or even on the day, of the accident; nor is there evidence of any defect in the ladder or in the scaffold itself, except the alleged failure to nail it to the scaffold.

█ The alleged liability of the railroad is based upon the Structural Work Act which, in so far as it is pertinent to the case at bar, provides as follows:

"§ 1. . . . all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any . . . building . . . shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon . . .

"§ 9. Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building . . . within the provisions of this act, shall comply with all the terms thereof . . .

". . .

". . .

"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby . . . ."

Under the clear unambiguous language of this statute, liability is imposed on the owner where the owner (1) is *in charge of* the erection of a building and (2) *wilfully violates* the act. On trial of the cause, the court adopted plaintiff's contention that the recent case of Kennerly v. Shell Oil Co., 13 Ill.2d 431, conclusively settled the issues presented in this proceeding.

277

■ A judicial opinion must be read as applicable only to the facts involved and is authority only for what is actually decided. Village of Lombard v. Illinois Bell Tel. Co., 405 Ill. 209, 219; Bowman v. Illinois Cent. R. Co., 9 Ill.App.2d 182, 197. Accordingly, the language of the Kennerly case must be read in connection with its factual background. Although it was not necessary in that case for the court to recite in detail all the facts out of which the case arose, the court stated its findings of fact in support of the legal conclusions there reached as to the liability of the defendant as follows (p. 439):

"In this case the proof shows that the floor of the scaffold from which the plaintiff fell was made of loose boards and that it had no handrail. Defendant knew that scaffolds were being used, and it can not escape the mandatory duty that the statute imposes by closing its eyes to their condition."

It thus appears that there was a clear violation of the statutory directive with respect to handrails, and that defendant, the owner, knew that such scaffolds were being used.

In the Kennerly case the court recited those facts which were relevant to a determination of liability, including knowledge on the part of the owner as to the defective scaffold, and relevant to a decision of the legal question there under review. We do not feel justified in indiscriminately and arbitrarily extending the limits of liability in order to cover a different set of facts. In reviewing the abstract of the Kennerly decision we find facts not set out in the opinion (inasmuch as they were not of importance in the disposition of that case) but which are helpful in a consideration of that case as applicable to the problem here. The scaffold on which Kennerly was working was thirty-seven feet above the ground and did not have guardrails—a significant consideration in view of the requirement of

section 1 of the Structural Work Act that scaffolding which is "more than twenty (20) feet from the ground . . . shall have, where practicable, a safety rail properly bolted, secured and braced, rising a [at] least thirty-four (34) inches above the floor . . . of such scaffolding . . ." This mandatory provision of the act was patently violated. Kennerly was injured by falling backward from the scaffolding. The evidence showed that for almost two years the oil company had men assigned to make a daily inspection of the work being done. There was no general contractor, but numerous subcontractors who were doing the work under the direction and supervision of the oil company engineers and inspectors. Kennerly testified that he talked to the inspector of the oil company on the day of the accident and told him that the scaffold was dangerous because it had no handrail around it; "nothing I can do about it," the inspector replied. An engineer answerable to the superintendent was present practically every day. The construction superintendent testified that the oil company requested that scaffolds be erected. These facts clearly indicate that the owner actually supervised the work and was fully advised of a pertinent defect which violated a statutory directive. Accordingly, liability had to be imposed on the *owner in charge of* the project who knew and in fact wilfully violated the mandatory duty as to handrails. Thus the decision in the Kennerly case was predicated on a significantly different status on the part of the owner; there was no occasion for the court to interpret the statutory requirement that the owner have charge since the evidence conclusively showed that it retained control and actually supervised the work.

If the legislature had wanted to make all owners liable, whether they had charge of the work or not, it would have been a simple matter—and certainly the logical solution—to omit the qualifying phrase "having

279

charge of the erection," etc. The use of the phrase suggests to us that the legislature reasoned that, under the requirements of this act, to hold liable any owner under all circumstances would be to place upon him an unconscionable, inequitable, and unrealistic burden. In many instances an owner is not in a position to know all the practical requirements of the act, nor to insist on compliance with them—a home owner, for example, who lets a contract for painting his home, or installing a new roof, attaching rain troughs or decorating the interior of his house, any one of which may require the use of scaffolds, ladders, or platforms. In this age of specialization not every owner can be expected to familiarize himself with the myriad techniques of construction work. By using the restrictive phrase "having charge of the erection," etc., the legislature, it seems to us, intended that the phrase should be operative; it cannot be by-passed by simply disregarding it. The lawbooks are replete with decisions in which the courts have interpreted statutes and given meaning to the language used by the legislature, but we know of no case where a court unequivocally sanctioned the deletion of a significant qualification in a statute. We do not think the Supreme Court did so in the Kennerly case because the facts there so conclusively indicated that the oil company, the owner, was in charge of and in fact completely supervised the project that it was not necessary for the court to interpret the restrictive phrase. We feel that the Scaffold Act, as interpreted in the Kennerly case, is applicable to an owner "having charge of the erection," etc.

We have sufficiently stated the facts in the case at bar to show, as we think, that there are significant differences between the facts in the Kennerly case and those in the case before us. Unlike the situation in the

Kennerly case, the failure here to nail the ladder to a scaffold did not violate a specific statutory requirement, and although there is evidence of a custom requiring that the ladder be nailed to the scaffold, it appears that each of the ladders used was moved from place to place as it was required, and there is no testimony that any of the ladders were nailed by the Marhoefer employees on this job; nor is there evidence that complaint was made by any of the Marhoefer personnel to the railroad personnel with regard to any defect in or difficulty with the ladder. It is also undisputed that no employee of the railroad was present at the time of the mishap, nor had any railroad employee visited the job site that day. Since the defect was recently created—the ladder had been placed against the scaffold only ten or twenty minutes before the accident—it would seem to us to be contrary to the manifest weight of the evidence for the jury to find a wilful violation of the act or wilful failure to comply with any of its provisions. In the Kennerly case the word "wilfully" was used as being synonymous with "knowingly"—a definition the court adopted from the earlier case of Schultz v. Henry Ericsson Co., 264 Ill. 156, together with the construction that " 'to constitute a wilful violation of the statute it is not necessary that there should have been "a reckless disregard" of its provisions. The employer is liable not only when the dangerous conditions are known to him, but also when by the exercise of reasonable care the existence of such dangerous conditions could have been discovered and become known to him. Peebles v. O'Gara Coal Co.' " Here the evidence does not justify a finding by the jury that the railroad knew or in the exercise of reasonable care could have discovered the alleged dangerous condition of the ladder which was constantly moved from place to place. Conversely, in

281

the Kennerly case the abstract of record shows that the defective equipment was always without a safety rail—thus creating a condition which patently violated a directive of the act; that such scaffold was obviously defective; and that the owner had been so advised and wilfully disregarded the defect.

■ Plaintiff proceeded, and the case was tried, upon the theory that the railroad was liable under the Structural Work Act even if it did not retain control or have "charge of" the work, relying heavily on the Kennerly case, where it was said that the act "has been regarded from the outset as intended to fix an independent, nondelegable duty of compliance upon the owner of the property and upon each contractor and subcontractor engaged in the work." In the case at bar, plaintiff does not claim that the railroad was in charge of the work, but, rather, contends that, notwithstanding the clear statutory requirement, the Kennerly case holds that the defendant is liable even if it did not supervise or have charge of the construction project. Although the courts have consistently imposed liability upon owners who have retained control and wilfully violated the act (Claffy v. Chicago Dock & Canal Co., 249 Ill. 210; Schultz v. Henry Ericsson Co., 264 Ill. 156; Kennerly v. Shell Oil Co., 13 Ill.2d 439), as we read the act, the duty can be imposed only upon "any owner . . . having charge of the . . . construction . . . of any building." To hold responsible an owner who is not in charge of the work is to enlarge his responsibility beyond the intention of the legislature. The phraseology of the act indicates to us that the legislature had in mind that an owner should be held responsible if he retained control of the construction, and that if he exercised control he could not relieve himself from liability for a mishap by means of an independent contract for the work. It seems to us that under the facts in the Kennerly case, the court did not intend

282

to eliminate a statutory element, but under plaintiff's contention, the plain, concise statutory requirement of liability imposed on an owner having charge has been completely deleted.

If plaintiff's interpretation is to be adopted by the courts, home owners will of necessity have to take out comprehensive liability insurance for every construction job they award to a contractor; the contractor is covered for injuries to the injured workman, but the owner is not.

■ It is clear that the act changed the prior law and does not permit persons who have charge or control to escape liability because of an independent contractor relationship. This historical change in the law is stressed in the Kennerly case, but the opinion was not addressed to the question of the statutory element of having charge (since the evidence there indisputably established that the oil company was actually in charge of and supervised the project from day to day) but, on the contrary, was a rejection and refutation of the attempt by a defendant which *did* have charge to contend that it did not have charge solely because it hired an independent contractor. The same defense had been asserted and rejected in the early case of Claffy v. Chicago Dock & Canal Co., 249 Ill. 210, where the defendant owner also retained control notwithstanding the hiring of an independent contractor.

■ ■ Proceeding upon the theory of absolute liability against an owner whether he had charge or not, the court gave two of plaintiff's instructions which, we think, were totally inadequate. Instruction No. 5 purported to set forth the elements of the Structural Work Act which were required to be proved by plaintiff, but it failed to include any reference to the statutory requirement of "having charge of" the erection. Moreover, not one of the court's instructions included this element. This omission was likewise evident in plain-

tiff's instruction No. 6, a peremptory instruction which also failed to make any reference to this statutory element. An instruction which is peremptory in character and directs a verdict for either party must necessarily contain all the elements necessary to sustain such a verdict, and it cannot be cured by any other instructions in the series. Duffy v. Cortesi, 2 Ill.2d 511; Hanson v. Trust Company of Chicago, 380 Ill. 194. The failure of these two instructions in the instant case to include the clear statutory mandate that liability is to be imposed only upon persons "having charge of" the erection was unwarranted and prejudicial to defendant, and deprived it of the right to have the jury pass on the question of fact whether the railroad supervised or was in charge of the construction.

In the view we take it will not be necessary to discuss whether the verdict was grossly excessive, as the railroad claims, or other points urged.

For the reasons indicated, the judgment of the Circuit Court is reversed and the cause remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

BRYANT, P. J. and BURKE, J., concur.