EMERSON LYLE, Plaintiff-Appellant, v. JOE SESTER, Defendant-Appellee.

Second District   Nos. 81-182, 81-307 cons.

Opinion filed December 31, 1981.

John P. Callahan, of Geneva, for appellant.

William R. Ketcham, of Brittain, Ketcham, Strass, Terlizzi, Flanagan, Weir & Johnson, of Elgin, for appellee.

JUSTICE VAN DEUSEN delivered the opinion of the court:

The plaintiff, Emerson Lyle, brought an action under the Structural Work Act (Act) (Ill. Rev. Stat. 1977, ch. 48, pars. 60-69) for injuries he sustained on August 16, 1978, when the scaffolding upon which he was working collapsed while he was framing the home of the defendant, Joe Sester. The court denied the defendant's motion for a directed verdict at the close of the plaintiff's case and similarly denied both parties' motions for directed verdicts at the close of all the evidence. The questions of liability and damages under the Act were submitted to the jury, which rendered a verdict for the plaintiff and against the defendant in the sum of $15,000. The court then entered judgment on the verdict.

Both parties have perfected separate appeals, which have been consolidated for appellate review. On appeal, the plaintiff first contends that certain comments which defense counsel made during closing argument implied that the defendant was not insured and were prejudicial to the plaintiff on the issue of damages. Secondly, the plaintiff asserts that the verdict of the jury was palpably inadequate under the facts of this case and a new trial should be granted on the issue of damages. On the other hand, the defendant maintains on review that liability was improperly imposed upon him because he did not "have charge of" the work and was

not guilty of a "wilful violation" of the Act's provisions as those terms are used in section 9 of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 69). Accordingly, he asserts that the trial court erred by not directing a verdict for him or entering a judgment notwithstanding the verdict in his favor as requested in his post-trial motion.

The testimony in this cause reveals that the defendant hired his brother, Gayle Sester, and the plaintiff, both of whom were journeymen carpenters, to frame the house which defendant was having constructed. When completed, the house would serve as the defendant's residence. The carpenters were hired to construct the floor, exterior walls, and the roof of the structure. They were not involved with either the excavation and laying of the foundation or the concrete, brick, and plasterboard work, all of which the defendant hired someone else to perform.

The plaintiff, whom the defendant paid on a weekly basis, related that he knew the defendant was not a carpenter and that the defendant was relying on his expertise as a carpenter. He explained that the defendant appeared at the job site quite often, either in the morning, at noon, or after he finished working for the telephone company. In July of 1978, the defendant visited the work site almost daily. The defendant's visits in the morning and at noon were confined to observing how the work was proceeding. When the defendant worked on the house at night and on the weekends, however, he helped the carpenters by nailing boards together for them. When the defendant came to the job site to help in the work, he sought the plaintiff's advice regarding what work he could accomplish without getting himself in trouble or getting in the way of the carpenters. The defendant never interfered with the plaintiff's work. Furthermore, the plaintiff knew what framing work had to be done and went ahead and did it. The defendant did not instruct him regarding how to do the work; did not tell him what tools and materials to use or what hours to work; and did not direct the order or manner in which the work was to proceed. The plaintiff supplied his own tools, and he and the other carpenter set their own hours.

The plaintiff further testified that he owned four blue brackets which the carpenters employed to support the scaffolding that they used while framing the house. The metal brackets were affixed to the wall studs by 16-penny nails which were nailed through the holes in the brackets. The nail holes on these brackets had notches to catch or secure the heads of the nails.

In addition to the blue brackets, the carpenters used a red bracket on the day in question to help secure the scaffolding to the north wall of the house. This bracket was also fastened by the use of 16-penny nails. The defendant purchased the red bracket, which the plaintiff believed was

inferior in quality to the blue ones. According to the plaintiff, the red bracket was not as heavy as the blue brackets and had an extremely large nail hole at the top; this large hole, however, did contain a notch similar to those on the blue brackets. The plaintiff, who had seen such red brackets used on other jobs, recognized the difference in construction between the two types of brackets before they were affixed to the studs. The defendant's brother nailed the red bracket to the wall stud. When the defendant first brought the red bracket to the job site, the plaintiff remarked that it was not as good as the blue brackets. In addition, the two carpenters expressed some concern among themselves regarding the use of the red bracket.

The plaintiff also stated that he did not get on a scaffold unless he was satisfied that it was safe, but admitted that he did not check the brackets before he stepped onto the scaffold on the day in question. If he would have inspected the red bracket to ascertain if it was properly fastened to the stud, he would have known what to look for. The plaintiff could not recall whether the defendant had anything to say about the use of the red bracket, but stated that he had never asked the defendant whether he (the plaintiff) should use the red bracket. He acknowledged, however, that the defendant had never told the carpenters where to use the scaffold and had not helped them put up the scaffold.

On August 16, 1978, the defendant's brother, Gayle Sester, nailed the five brackets to the studs on the north wall of the partially-constructed building. In particular, he placed a 16-penny nail in each small hole at the bottom of the red bracket and at least six of those nails in the larger hole at the top of the bracket. Once the scaffolding was erected, the carpenters stepped onto it and began to work alongside each other. The scaffold suddenly collapsed and both men fell 16 feet to the ground. The red bracket also fell to the ground while the nails which had been placed in the bracket's top hole remained in the stud. The four blue brackets, however, stayed in place. Gayle Sester concluded that the top hole had been too large for the cluster of nails and the bracket had pulled over the top of those nails. Both carpenters stated that, in retrospect, a lag bolt should have been used to secure the red bracket to the wall stud.

Gayle Sester stated that the defendant was the general contractor on the job and usually came to the job site in the evenings to inspect the work which had been done during the day. While the defendant was not a carpenter and relied on the carpenter's expertise, he nonetheless helped with the carpentry work. The defendant did the wiring and the plumbing work on the house. According to the witness, the defendant had never before attempted to build a house and had not worked for anybody as a carpenter, although he had some knowledge in the field of carpentry and

had done some carpentry work on his own. Gayle and the plaintiff directed the defendant to purchase the red bracket involved in the accident.

Gayle did not believe his brother had any experience with or expertise concerning the construction or use of scaffolds and had never observed the defendant put up a scaffold. In addition, the defendant did not put up the scaffold in question; did not tell the carpenters how to construct or secure the scaffold; and did not inform them how to carry out the construction work. According to Gayle Sester, both he and the plaintiff, as journeymen carpenters, knew how to construct a scaffold and what to look for when building it, but the defendant, as a layman, did not have sufficient knowledge to know what to look for if he attempted to ascertain whether the brackets had been installed properly. Gayle was satisfied that the scaffold was safe before he got onto it.

David Aldridge, a journeyman carpenter, stated that the blue brackets were adequately secured by the use of 16-penny nails, because these brackets were able to slip onto the heads of the nails. By contrast, however, the red bracket should have been secured by something that had a head larger than a 16-penny nail, such as a lag bolt. In his opinion, a cluster of 16-penny nails placed in the top hole of the red bracket would be inadequate to support the bracket. He also rendered his professional opinion that a person who was not trained as a journeyman carpenter and who did not have the expertise of an experienced carpenter would not know what to look for in determining whether a support bracket had been installed properly and would not appreciate the effect of putting a cluster of nails into the large hole in the top of the red support bracket.

The defendant, who worked as a telephone switchman, related that he was not a carpenter, had not received any training as such, and had never worked for anybody in that capacity. He bought the original plans for the house, made changes in them, and designed the house. He wired the house and installed the plumbing himself, but hired others to do the rest of the work. Never having built or framed a house before, he hired the carpenters to frame the house. He visited the job site almost daily to see how the work was progressing. He had the right to change things if they were not constructed in accordance with the plans, although there never was anything that needed to be changed.

In the evenings he helped the plaintiff and Gayle with the carpentry work, but the carpenters would tell him where they needed him. He asked the plaintiff's advice regarding how things should be done, but the plaintiff never asked him for counsel regarding the performance of the carpentry work. In addition, the defendant did not tell the carpenters how or the order in which they were to perform their work; did not set the hours they were to work or assign them daily tasks; and did not tell the

carpenters, who supplied their own tools, which tools to use or how to use them. He relied on their expertise as carpenters and never had occasion to refuse them any materials that they requested.

Furthermore, defendant had no experience in erecting scaffolds, did not know how to do so, and did not direct the use of the scaffolding used at the work site. Similarly, he did not inspect the scaffolding on this job or any other job and would not have known what to look for during such an inspection. He never stepped onto the scaffold in question, took no part in erecting it, and never saw it up on the north wall of the house before it collapsed.

The defendant bought the red bracket in question at the request of his brother Gayle two days before the accident. He had had no opportunity to use wall brackets and did not know the difference between the two different types of brackets used to fasten the scaffold, except that the red bracket was smaller than the blue one. When called as a section 60 witness, he stated that he did not know how or where the brackets should be installed or fastened to the wall. However, during cross-examination when he testified as his own witness, he admitted he knew how the blue brackets had been attached to the east wall because he had observed them there when he was on the scaffold helping the carpenters work. He could not remember, however, whether he had helped fasten the blue brackets to any of the walls. When he procured the red bracket, he did not notice the type of hole at the top of it. While admitting that the carpenters had made uncomplimentary comments regarding the red bracket he had given them, he could not remember the substance of the remarks. Lastly, he was not present at the job site when the accident occurred.

In his cross-appeal the defendant contends that the trial court improperly denied his motions for a directed verdict and judgment notwithstanding the verdict because he (1) did not "have charge of" the particular operations which caused plaintiff's injuries and (2) did not commit a "wilful violation" of the Act's provisions governing the safe erection of the scaffolds.

As this court has recently commented, the goal of the Act is to provide workers in extrahazardous occupations with a safe place to work, and the courts will construe the Act liberally to carry out this purpose. (*Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668, 671; *Hernandez v. Power Construction Co.* (1976), 43 Ill. App. 3d 860, 865-66, *aff'd* (1978), 73 Ill. 2d 90.) The plaintiff, however, must establish an actual violation of the Act before he can recover. *Zizzo v. Ben Pekin Corp.* (1979), 79 Ill. App. 3d 386, 393.

■■■ Section 9 of the Act (Ill. Rev. Stat. 1977, ch. 48, par. 69) places civil liability for "wilful violations" of its provisions on any owner "having charge of" the erection of the building at the time of the plaintiff's injury.

(*Kirk v. Walter E. Deuchler Associates, Inc.* (1979), 79 Ill. App. 3d 416, 419.) Thus, before civil liability can arise under the Act, the plaintiff must prove both that the defendant was in charge of the work and committed a wilful violation. (*Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 574; *Alfano v. Board of Trade* (1979), 76 Ill. App. 3d 248, 250; *Moore v. Clearing Industrial District, Inc.* (1978), 64 Ill. App. 3d 391, 395-96; *Getz v. Del E. Webb Corp.* (1976), 38 Ill. App. 3d 880, 886.) It is well established that these issues are generally questions of fact to be resolved by the factfinder (*Winter v. Davis* (1980), 85 Ill. App. 3d 912, 915 (charge); *Katz v. Shaf Home Builders, Inc.* (1981), 94 Ill. App. 3d 526, 528 (wilful)), but the trial court may grant a directed verdict on these issues when there is insufficient evidence to create a factual question (*Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 9 (charge); see *Ewert v. Wieboldt Stores, Inc.* (1980), 84 Ill. App. 3d 1008, 1015 (wilful)). Another rule of long standing in this State is that motions for a directed verdict and judgment *n.o.v.* will not be granted unless the totality of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; *Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 8.) Under the *Pedrick* rule, then, the defendant is not entitled to a directed verdict or judgment notwithstanding the verdict if there is competent and material evidence in the record that he had charge of the work and wilfully violated the Act's provisions in a manner which contributed to the plaintiff's injuries. See *Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 572.

A wilful violation of the Act occurs when the owner knows a dangerous condition exists on a scaffold or, by the exercise of reasonable care, could have discovered the existence of such a dangerous condition. *Katz v. Shaf Home Builders, Inc.* (1981), 94 Ill. App. 3d 526, 528; *Ewert v. Wieboldt Stores, Inc.* (1980), 84 Ill. App. 3d 1008, 1015; *Zizzo v. Ben Pekin Corp.* (1979), 79 Ill. App. 3d 386, 395-96; *Kjellesvik v. Commonwealth Edison Co.* (1979), 73 Ill. App. 3d 773, 775-76; *Hernandez v. Power Construction Co.* (1976), 43 Ill. App. 3d 860, 867, *aff'd* (1978), 73 Ill. 2d 90.

The cases cited above, among others, have delineated general guidelines regarding what evidence is sufficient to establish that the defendant has not met the *Pedrick* standard on the issue of wilful violation. For example, in *Ewert* the court concluded that a directed verdict was properly denied the defendant where (1) the industry safety standards recommended the use of a larger size anchor; (2) the defendant had the larger size on most of its windows; (3) the difference between the two types of anchors was apparent to the naked eye; (4) the defendant had inspected the building prior to purchasing it and had a maintenance de-

partment to supervise the repairs of the building; and (5) the defendant maintained it did not inspect the outside of the building and was unaware some of the anchors were undersize. (84 Ill. App. 3d 1008, 1015.) Again, in *Kjellesvik* a directed verdict and judgment *n.o.v.* were correctly denied because the absence of guardrails required under the Act was known to the defendant, who had field engineers at the work site prior to the accident. (73 Ill. App. 3d 773, 776.) Similarly, the defendant was not entitled to a directed verdict in *Moore v. Clearing Industrial District, Inc.* (1978), 64 Ill. App. 3d 391, 397, where the absence of guardrails and the scaffold's failure to extend the full width of the work area could have been determined at a glance. Also, the defendant, who made regular inspections and was aware of every stage of the work, could have discovered the dangerous condition in the scaffold had its inspector visited the site to examine progress on the wall. In *Hernandez*, the trial court incorrectly directed a verdict in favor of a general contractor which had overall supervision of the construction project, had the responsibility to see that all scaffolding was properly erected and fastened and that work conditions were safe each day, had inspected the scaffold when it was originally constructed, and would point out any glaring errors he observed. (43 Ill. App. 3d 860, 867-68.) The plaintiff in *Turner v. Commonwealth Edison Co.* (1976), 35 Ill. App. 3d 331, 335-36, presented sufficient evidence on the wilfulness issue to make it error for the trial court to grant the defendant a judgment *n.o.v.* where the record showed that the "cherry pickers" were used in a dangerous manner and had defects, their unsafe use was discussed at a safety meeting, and the defendant's field engineers were regularly on the premises. Of a similar nature are *Katz v. Shaf Home Builders, Inc.* (1981), 94 Ill. App. 3d 526, 529, and *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 516, cases in which the jury was correct in finding a wilful violation of the Act. In *Katz*, the fact that the scaffold was insufficiently braced should have been apparent to the defendant-general contractor upon general inspection; also, an agent of the defendant was present shortly before the accident, and the scaffold shook when he touched it. The defendant in *Burke* had knowledge of the use of the crane near the power lines, and its employees, who were monitoring the project at the time of the accident, knew of the danger and did nothing to alleviate the hazard.

■■ When read together, the above cases reveal that a defendant fails to satisfy the *Pedrick* rule where there is competent evidence that the dangerous condition is apparent to or readily discoverable by the defendant or its representatives, or where the defendant either has overall supervision of the construction project and the responsibility to see that all scaffolding is assembled and fastened properly or fails to comply with well-known industry safety standards.

In the present case, the undisputed testimony established that the defendant, although having some basic knowledge in the field of carpentry, was not a journeyman carpenter; had no experience in erecting scaffolds; did not know how to do so; did not direct the use of the scaffold employed at the work site; never stepped onto the scaffold used on the north wall; took no part in erecting it; did not see it up on the north wall of the structure before the scaffold collapsed; did not affix the red bracket to the wall stud; and was not present at the job site at the time of the accident. Similarly, the defendant stated he would not have known what to look for during an inspection of the scaffold to check for unsafe conditions. This view was corroborated by the testimony of two journeymen carpenters, witnesses for the plaintiff, who gave their opinions that the defendant, as a layman, did not possess sufficient knowledge to know what to look for if he had attempted to ascertain whether the support brackets had been installed properly and would not appreciate the effect of placing a group of 16-penny nails into the large hole at the top of the red support bracket. In addition, the defendant did not know the difference between the two different types of brackets used to secure the scaffold to the wall, except that the red bracket was smaller than the blue one. By contrast, however, the plaintiff, who had seen similar red brackets used on other construction projects, recognized the difference in construction between the two types of brackets before they were affixed to the wall studs. Also, the two journeymen carpenters whom the defendant employed stated that, in hindsight, they should have secured the red bracket with a lag bolt.

Although the defendant admitted that he had been on a scaffold earlier during the work on the house and knew how the blue brackets were fastened to the studs, this evidence alone does not indicate that the defendant knew or, in the exercise of reasonable care, should have known of the unsafe manner in which the red bracket was fastened to the north wall. Apparently, the defendant did not know, prior to the accident, the manner by which the red bracket was affixed to the wall. Furthermore, even if he had been aware of how it was secured, this fact, by itself, would be insufficient to demonstrate that he should have known that it was fastened improperly, given both his lack of expertise and the fact that the blue brackets were also secured by the use of 16-penny nails. While the defendant testified that the carpenters had made uncomplimentary comments regarding the red bracket, and the plaintiff related that he had remarked, when the defendant first brought the bracket to the job site, that it was not as good as the blue brackets, there is no evidence in the record that the carpenters either informed the defendant or even suggested or intimated to him that the red support bracket was defective, inadequate or unsafe for the job, or otherwise inappropriate for the

purpose of securing a scaffold. Rather, Gayle Sester was satisfied that the scaffold was safe before he got onto it, and the plaintiff stated that he did not stand on a scaffold unless he was certain that it was safe, although he did not inspect the brackets before he stepped onto the scaffold on the day in question.

■■ The above evidence, when measured against the *Pedrick* standard and the principles of law governing liability under the Act for a wilful violation, causes us to conclude that the defendant was entitled to a directed verdict on this issue. The evidence overwhelmingly demonstrated, first, that the defendant did not know of the dangerous manner in which the scaffold was secured to the wall studs and, second, that he could not, by the exercise of reasonable care, have discovered the presence of the dangerous condition. To find a wilful violation here would place a heavy burden on a residential owner, such as the defendant, who hires an independent contractor to work on his house. In effect, this court would be placing on the defendant an affirmative duty or obligation to inspect scaffolding, or have it inspected, so as to avoid possible civil liability. In the vast majority of cases, as here, residential owners lack the requisite knowledge and skill that is essential to construction operations and, accordingly, cannot be expected to enforce safety provisions about which they have no knowledge or do not understand; thus, they must rely, in appropriate circumstances, upon independent contractors, who are knowledgeable in the building trades, to perform their work properly and in a safe manner. See Comment, 1975 Ill. L.F. 393, 406-07; *Buehler v. Toynan Construction Co.* (1972), 52 Ill. 2d 214, 216-17.

With respect to the second issue which the defendant raises in his cross-appeal, it has been pointed out, and correctly so, that the statutory "having charge of" language has received many and sometimes ambiguous interpretations. (*Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 1140, citing *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481.) Recently, this court has had occasion to review much of the jurisprudence governing a determination of whether a defendant had charge of the work under the Act. (See *Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668; *Banwart v. Okesson* (1980), 83 Ill. App. 3d 222; *Kirk v. Walter E. Deuchler Associates, Inc.* (1979), 79 Ill. App. 3d 416.) Also, a discussion of recent supreme court cases which have addressed this issue appears in *Greenstreet v. Deere & Co.* (1980), 81 Ill. App. 3d 508, 513-16.

The phrase "having charge of" has not been defined in specific terms by Illinois courts, but rather has been referred to as a term of common usage and understanding. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 323; *Gruszeczki v. Acme-Cleveland Corp.* (1979), 70 Ill.

App. 3d 476, 480.) However, the court in *Larson* rejected the argument that the exercise of supervision and control of the work, or the right to do so, are essential ingredients for having charge; while they may be factors bearing on the ultimate question, they are not necessary or conclusive factors. At the same time the court stressed that "an owner must have some direct connection with the operations, over and above mere ownership or the employment of an independent contractor" before he could be found to be in charge of the work. (33 Ill. 2d 316, 322.) The Act, however, does not permit an owner who had control to escape liability because he has hired an independent contractor. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1960), 25 Ill. App. 2d 272, 283, *aff'd* (1961), 22 Ill. 2d 305.) In the final analysis, the question of whether an owner had charge involves an assessment of the totality of the circumstances and is determined not only from his contractual obligations but also from the surrounding circumstances and the role he actually assumed. *Winter v. Davis* (1980), 85 Ill. App. 3d 912, 916, and cases cited therein; *Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 9-10; see *Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 1139-40.

The courts have identified a number of factors which should be considered in determining whether the totality of the circumstances establishes that a party had charge of the work, including but not limited to: (1) supervision and control of the work, or the retention of the right to supervise and control it; (2) constant participation in ongoing activities at the construction site; (3) supervision and coordination of subcontractors; (4) responsibility for taking safety precautions at the job site; (5) authority to issue change orders; and (6) the right to stop the work. (*Hausam v. Victor Gruen & Associates* (1980), 86 Ill. App. 3d 1145, 1147; *Westerfield v. Arjack Co.* (1979), 78 Ill. App. 3d 137, 142, and cases cited therein.) In addition, the courts also consider ownership of the equipment used at the job site as well as the defendant's familiarity with construction customs and practices. (*Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 10.) Another relevant consideration is whether the defendant was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits. *Winter v. Davis* (1980), 85 Ill. App. 3d 912, 917.

Decisions addressing the circumstances under which a factual question is presented regarding whether a defendant owner has charge of the work are legion. For example, in *Banwart v. Okesson* (1980), 83 Ill. App. 3d 222, 226-27, this court upheld the denial of the defendant's motion for judgment *n.o.v.*, holding that the defendant owner had charge of the work where he provided the scaffolding, assisted in assembling it, instructed the workers where to place it, and attempted to provide additional instructions to the workers. The defendant owner in *Moore v. Clearing Industrial District, Inc.* (1978), 64 Ill. App. 3d 391, 396 was not

entitled to a directed verdict because it had charge of the work by virtue of its frequent inspections, the right to change work orders, the right to remedy deficiencies in the contractor's performance and to terminate the contractor's services for violation of its contract, which included requirements for compliance with applicable safety laws. The court concluded that the defendant's influence on job site safety procedures was apparent.

In contrast to the above cases are *Winter v. Davis* (1980), 85 Ill. App. 3d 912, and *Melvin v. Thompson* (1963), 39 Ill. App. 2d 413; this latter case was discussed at length and distinguished in *Banwart v. Okesson* (1980), 83 Ill. App. 3d 222, 225-26. The court in *Winter v. Davis* upheld the trial court's granting of a directed verdict in favor of the defendant homeowner on the issue of having charge of the work, while the court in *Melvin v. Thompson* affirmed the trial court's award of summary judgment for the defendant owner on this question. The facts of the present case are most closely analogous to those presented to the court in *Winter v. Davis*. In some regards, however, the facts of this case are more compelling than those in *Davis*. One distinguishing factor, though, is that here, unlike the situation in *Davis*, the defendant was frequently present during the course of the work and participated to a limited extent in the framing activities at the job site, although not in a supervisory capacity. Without attempting to explicate here the facts of *Winter v. Davis* and *Melvin v. Thompson*, we say that the present case is closer to the situations involved in those cases than to the facts presented in *Banwart v. Okesson* and *Moore v. Clearing Industrial District, Inc.*

It is undisputed in the present case that the defendant, who hired independent contractors to frame his house, did not exercise supervision or control over the framing work and did not retain the right to do so. In addition, he did not direct the carpenters regarding the manner or order in which they should perform their work. As in *Winter v. Davis*, the plaintiff and the other carpenter here enjoyed a tremendous amount of autonomy on the job. Furthermore, defendant had no express responsibility for taking safety precautions at the work site and, due to his lack of expertise or extensive experience in construction matters, was not in a position to assure worker safety or prevent or alleviate either equipment deficiencies or improper work habits. Moreover, the defendant did not supply any of the tools or equipment used in the work, including the scaffold, except for the red bracket. However, this bracket, although smaller than the others, was not defective or inherently unsafe or unsuitable for the task of helping to secure the scaffold to the wall. Rather, it was the manner in which the carpenters affixed it to the wall stud which occasioned the accident. On the other hand, the defendant was present at the work site on a daily basis and also helped in minor ways with the carpentry work, although apparently under the supervision and

direction of the carpenters. His main tasks, however, were confined to the electrical and plumbing work. While the defendant did check the progress of the work and had the right to make changes if the work was not constructed in accordance with his wishes, this action or right of action amounted to nothing more than the inherent rights of an owner to observe the course of the work, require contract compliance, and terminate unsatisfactory performance. See *Winter v. Davis* (1980), 85 Ill. App. 3d 912, 916; *Jacobson v. 190 North State Street, Inc.* (1971), 2 Ill. App. 3d 256, 260; *Melvin v. Thompson* (1963), 39 Ill. App. 2d 413, 417-18. ▪▪ Based on the above evidence, we conclude, relying primarily upon *Winter v. Davis*, that the defendant was also entitled to a directed verdict or judgment *n.o.v.* under *Pedrick* on the "having charge of" the work question.

Since the defendant was entitled to a judgment *n.o.v.* in his favor, we do not reach the issues raised by the plaintiff concerning damages.

The judgment in favor of plaintiff and against the defendant in the amount of $15,500 is vacated, and judgment is hereby entered in favor of the defendant, and against the plaintiff and defendant shall have judgment for his costs.

Reversed.

SEIDENFELD, P. J., and UNVERZAGT, J., concur.